**Thomas H. FITZGERALD, Plaintiff-Appellant,**

v.

**Martin P. CATHERWOOD, as Industrial Commissioner of the State of New York, Defendant-Appellee.**

No. 212, Docket 31209.

United States Court of Appeals Second Circuit.

Argued Nov. 30, 1967.

Decided Jan. 2, 1968.

Bernard H. Fitzpatrick, New York City (Butler, Fitzpatrick & De Sio, New York City, Thomas Sheenan, Mineola, N. Y., of counsel), for appellant.

Joel Lewittes, Asst. Atty. Gen., State of New York (Louis J. Lefkowitz, Atty. Gen., Samuel A. Hirshowitz, First Asst. Atty. Gen., of counsel), for appellee.

Before MOORE, SMITH and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

The issue before us on this appeal is the validity of those provisions of New York's Labor and Management Improper Practices Act which make it a misdemeanor for an officer of a labor organization to hold a financial interest in an employer whose employees the organization represents.[1] The appellant, Thomas H. Fitzgerald, sought a declaratory judgment in the court below decreeing that the challenged legislation is preempted by the Labor Management Reporting and Disclosure Act of 1959 [LMRDA], 29 U.S.C. § 401 et seq., and that it constitutes a Bill of Attainder in violation of Article I, Section 10 of the United States Constitution.[2] In addition, the complaint sought to restrain the state official charged with administering the act from enforcing the legislation. Judge Cannella denied appellant's motion for the convening of a three-judge district court and granted summary judgment for the appellee. We affirm.

I.

The facts are undisputed and can be stated briefly. Fitzgerald concededly wears two hats. He is the duly elected president of Theatrical Union Number One [union] (affiliated with International Alliance of Theatrical Stage Employees, A.F.L.-C.I.O.), and is also president and sole stockholder of Sound Associates, Inc., a corporation which has a collective bargaining agreement with the union and employs union members. The union represents workers in the theatrical and television broadcasting industries and is certified by the National Labor Relations Board; Sound Associates is engaged in several phases of these industries concerned in the main with electronic auditory equipment. The state concedes that the union membership was aware of Fitzgerald's position with Sound Associates when he was elected union president. Indeed, his dual position appears to have been a major issue in the election. It is also conceded that Fitzgerald's relationship with the union and the corporation

---

1. New York Labor Law, McKinney's Consol.Laws, c. 31, § 723 provides:
 1. Without limiting his fiduciary obligation provided in section seven hundred twenty-two, it shall constitute a violation of his fiduciary obligation for an officer or agent of a labor organization:
 (a) To have, directly or indirectly, any financial interest in any business or transaction of either an employer whose employees his labor organization represents or seeks to represent for purposes of collective bargaining, or an employer who is in the same industry as such an employer;
 (b) To have, directly or indirectly, any financial interest in the business or transaction of any person who sells to, buys from, or otherwise deals with (i) an employer whose employees his labor organization represents or seeks to represent for purposes of collective bargaining, or (ii) an employer organization which represents such employer, or (iii) an employer who is in the same industry as such an employer;

 New York Labor Law § 725 provides:
 4. Each wilful and knowing violation of any of the provisions of sections seven hundred twenty-three or seven hundred twenty-four of this article shall constitute a misdemeanor, punishable by imprisonment for not more than one year, or by a fine of not more than one thousand dollars, or by both.

2. Art. I § 10 provides in pertinent part that: "No State * * * shall pass any Bill of Attainder."

constitutes a violation of the New York act. It is clear, moreover, that the appellee has threatened to enforce the penal provisions of the act and has called upon Fitzgerald to divest himself of his interest in Sound Associates (or, we presume, resign his union office). Thus, this is not a case in which a litigant seeks to enjoin a state prosecution which may never materialize. We are squarely faced, therefore, with the need to evaluate the merits of appellant's contentions.

## II.

 Whatever may have been the law in the past, no authority need be cited for the clearly accepted principle that Congress has the power to regulate labor relations—including the qualifications for, and the fiduciary obligations of, union office—in industries affecting interstate commerce. We state this at the outset to clarify what we are not concerned with—the extent of national power. Instead, we must direct our attention to the scope and limitations of the actual regulation. There is little doubt that when Congress indicates an intent to preempt an area over which there is federal jurisdiction, the Supremacy Clause of the Constitution precludes the states from legislating in that field. Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 229–230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). But, the Supreme Court has given us this caveat:

> "[i]n areas of the law not inherently requiring national uniformity * * * state statutes, otherwise valid, must be upheld unless there is found 'such actual conflict between the two schemes of regulation that both cannot stand in the same area, [or] evidence of a congressional design to preempt the field.'" Head v. New Mexico Board of Examiners, 374 U.S. 424, 430, 83 S. Ct. 1759, 1763, 10 L.Ed.2d 983 (1963) (citation and footnote omitted).

That the federal and state enactments may serve the same end is not determinative of the question. Before finding preemption "we must be able to conclude that the purpose of the federal statute would to some extent be frustrated by the state statute." Colorado Anti-Discrimination Commission v. Continental Air Lines, 372 U.S. 714, 722, 83 S.Ct. 1022, 1026, 10 L.Ed.2d 84 (1963). See also Nash v. Florida Industrial Commission, 389 U.S. 235, 88 S.Ct. 362, 19 L.Ed.2d 438 (Dec. 5, 1967). With this principle in mind, we conclude that there is no conflict between the LMRDA and the challenged provisions of the New York act.

The federal and state statutes—both passed in 1959—were designed to impose curbs on a variety of corrupt practices by union officials which had come to light in various investigations. Compare 29 U.S.C. § 401, with N.Y. Labor Law § 720. Accordingly, both statutes contain provisions dealing with the fiduciary responsibilities of officers and agents of labor organizations. 29 U.S.C. § 501; N.Y. Labor Law §§ 722–723. We do not understand the appellant to maintain that there is a conflict between the fiduciary provisions of the two laws. Indeed, such a contention would have little merit. Section 501 of the LMRDA imposes a duty on all union officials "to refrain from dealing with such organization [the unions they represent] as an adverse party * * * and from holding or acquiring any pecuniary or personal interest which conflicts with the interest of such organization." And, the Congressional debates disclose that "the principle of fiduciary responsibility is violated whenever a union officer acquires an interest in a business concern with which he engages in collective bargaining as an employees' representative." [3] Since the New York legislation

---

3. 105 Cong.Rec. 14213 (daily ed. Aug. 11, 1959) (speech of Representative Elliot). The wording of Section 501, as enacted, precisely conforms with the fiduciary responsibility provision of the bill sponsored by Representative Elliot. The Elliot Bill was reported by the House Committee on Education and Labor but the Landrum-Griffin Bill was substituted on the floor of the House by way of amendment. See Dugan, Fiduciary Obligations Under the New Act, 48 Geo.L.J. 277, 291 (1959).

merely imposes an additional remedy if a union officer acquires such an interest, it can hardly be said to frustrate the Congressional purpose.

Appellant's contention, however, has more subtlety. He argues that the state law conflicts with the election provisions of the LMRDA. In particular, he urges that Section 401(e), 29 U.S.C. § 481(e), which provides in relevant part, that

> "every [union] member in good standing shall be eligible to be a candidate and to hold office"

and Section 403, 29 U.S.C. § 483, which states that

> "[n]o labor organization shall be required by law to conduct elections * * * in a different form or manner than is required by its own constitution or by-laws, except as otherwise provided by this subchapter"

manifests a Congressional intent to bar the states from imposing additional qualifications for holding union office. And, he directs our attention to statements in the legislative history which he says make it evident that Congress recognized a need for national uniformity in the laws governing union elections, S. Rep. No. 187, 86 Cong., 1st Sess. 21–22 U.S. Code Congressional and Administrative News, p. 2318 (1959); that Congress had decided to leave to the union members themselves the responsibility of deciding who could or could not be trusted with union office particularly where the possible conflicts of interest had been disclosed pursuant to the reporting and disclosure provisions of the act, Id. at 16.

The Industrial Commissioner's response to this claim is that the New York enactment does not prohibit any union member from being elected to union office; it merely imposes fiduciary obligations upon those elected. He urges that a duly elected officer can comply with the requirements of the New York law without in any way violating his duties under the LMRDA. All he need do is to divest himself of his financial interest in the employer—the very thing the Commissioner requested Fitzgerald to do in this case. The question remains, therefore, whether there is any reason to preclude the state from legislating in this area which concerns itself principally with possible interest conflicts or from enforcing its fiduciary requirements by means of the criminal law.

The legislative history of the LMRDA discloses considerable time and thought devoted to the relationship *inter se* of federal and state law and to the problem of federal preemption.[4] Congress provided different solutions in different sections of the act. Professor Summers has stated:

> "The relationship of federal and state remedies in union elections is totally different from that in other areas, for title IV [dealing with elections] proceeds from opposite premises. In direct contrast to * * * [those provisions] which permit each state to superimpose its rights and remedies on a federal guaranteed minimum, title IV constitutes a comprehensive code which is to provide a single uniform body of law." Summers, Pre-emption and the Labor Reform Act—Dual Rights and Remedies, 22 Ohio St. L. J. 119, 135 (1961).

Congress was obviously concerned not to make it unduly burdensome or even impossible for unions functioning in several states to comply with a myriad of conflicting election laws. S. Rep. No. 187, 86th Cong., 1st Sess. 21–22 (1959). The focus of attention was on the need to have uniform rules governing the procedural aspects of union elections. Thus, the Senate committee report cited as an example of its concern the undesirability of having too frequent elections for this could result in instability in collective bargaining relationships with employers. Ibid.

Congress' solution to the problem of the relationship of federal and state law was quite different when it dealt with

---

4. See, e. g., 105 Cong.Rec. 5319–20 (daily ed. April 22, 1959).

fiduciary obligations. It sought to establish a federal minimum norm and did not intend to reduce or interfere with obligations imposed by state law. 105 Cong. Rec. 5856–61 (daily ed. April 23, 1959); Summers, Pre-emption and the Labor Reform Act, supra, at 140. Accordingly, Section 603(a), 29 U.S.C. § 523(a) provides that:

> "Except as explicitly provided to the contrary, nothing in this chapter shall reduce or limit the responsibilities of any labor organization or any officer, agent, shop steward, or other representative of a labor organization * * * under any other Federal law or under the laws of any State * * *."

And this section—which has been described as "an express disclaimer of pre-emption of state laws regulating the responsibilities of union officials, except where such preemption is expressly provided," De Veau v. Braisted, 363 U.S. 144, 157, 80 S.Ct. 1146, 1153, 4 L.Ed.2d 1109 (1960) (plurality opinion)—originated as a savings clause incorporated in the fiduciary obligation provision added during the Senate debate. 109 Cong. Rec. 5860 (daily ed. April 23, 1959). See Summers, Pre-emption and the Labor Reform Act, supra, at 140.

The divergent treatment of preemption with respect to the election and fiduciary sections of the LMRDA is not difficult to rationalize. There does not appear to be a pressing need for national uniformity in defining or safeguarding fiduciary responsibilities. Conflict-of-interest laws set down standards of acceptable or objectionable behavior. We cannot conceive of any unreasonable burden placed upon union officers required to comply with the fiduciary requirements of the various states in which their unions function. This is especially true where, as here, the state enactment merely imposes a different remedy for behavior that lies within the scope of the federal act. The mandate of Section 603(a) seems apparent to us.

Appellant insists, however, that even if the LMRDA permits the states to impose additional fiduciary obligations on union officers, it does not permit them to enforce those obligations by means of the criminal law. To shore up his argument he points to Section 504(a), 29 U.S.C. § 504(a), which disqualifies two classes of persons from holding union office—communists and certain felons—and to Section 604, 29 U.S.C. § 524, which provides that nothing in the LMRDA shall be construed to impair the authority of the states to enforce general criminal laws concerned with certain specified offenses. Since, the appellant urges, the violation of fiduciary obligations is not one of those listed in Section 604, Congress intended to bar the states from enacting criminal penalties in that area.

But, as we have noted, Section 603(a) is a clear disclaimer of an intent to preempt "except as explicitly provided to the contrary," and we do not read Section 604 as an explicit limitation of the recognition of state power in Section 603. On the contrary, both sections invite the exertion of state jurisdiction. We see no reason to attribute to Congress an unstated intent to limit the power of the states to legislate in the area of fiduciary responsibility merely because it declared that it did not mean to interfere with the enforcement of general criminal laws.[5]

---

5. The offenses specified in Section 604 —of which robbery, arson and rape are typical—are precisely those for which conviction bars an individual from holding union office (for five years after the end of his imprisonment) under Section 504. The purpose of Section 604 was to make it manifestly clear that the numerous references in the LMRDA to various offenses was not intended to impair the power of the states to enforce their general criminal laws. 105 Cong.Rec. 5991 (daily ed. April 24, 1959) (statement of Senator Morse). Senator Morse also stated that:

> "[w]ithout the amendment [ultimately Section 604] it might be possible to argue that any State statute dealing with matters specifically covered in the bill—such as the provisions limiting the

When Congress intended to preempt state law under LMRDA, it left no doubt on that score. For example, Section 205(c), 29 U.S.C. § 435(c), states that "[n]o person shall be required by reason of any law of any State to furnish to any officer or agency of such State any information included in a report filed [pursuant to the LMRDA] * * *."

▉▉ We are fortified in our conclusion that the LMRDA does not preempt the challenged New York legislation by its legislative history. Frequent references to the state act are made throughout and its merits were discussed during debates in which the relationship of federal and state law was the issue.[6] We recognize, of course, that the determination of Congressional intent is a hazardous undertaking. And we would be hesitant to infer from the discussion of the New York legislation a determination not to preempt the field were it not for the extensive attention given by Congress to the relationship between federal and state law. Under these circumstances we are impelled to the conclusion that if Congress intended to bar the type of provision New York had enacted, it would have said so explicitly or implicitly. Instead, it provided us with a broad savings clause expressly disclaiming preemption in the area of fiduciary responsibilities.

Nor do we regard Hill v. State of Florida ex rel. Watson, 325 U.S. 538, 65

S.Ct. 1373, 89 L.Ed. 1782 (1945) as requiring a contrary result. The Court held that the collective bargaining regulations of the National Labor Relations Act [NLRA], 49 Stat. 449, preempted a state statute which provided that no one shall be licensed as a business agent of a labor union who has not been a citizen of the United States for more than 10 years, who has been convicted of a felony or who is not a person of good moral character. The Court reasoned that the statute interfered with the "full freedom" of the union members to choose their agents as guaranteed by the NLRA. Id. at 541, 65 S.Ct. 1373. But, the continued vitality of *Hill* on this point may be questioned in light of the Court's subsequent holding in De Veau v. Braisted, supra, that neither the NLRA nor the LMRDA preempted a New York statute which disqualified any person who had been convicted of a felony (and who was not subsequently pardoned) from holding office in any waterfront labor organization. In any event, general observations are not particularly helpful in solving the problem posed. The question of preemption can be answered only after consideration of the particular statutes involved, their legislative history and the underlying policy considerations. This is especially so where, as here, the statute was not drafted in a vacuum but with an eye on the problem of preemption.[7]

tours of office of union officers—would be valid if enacted as a criminal statute." Ibid.
But, as the example makes plain, the concern was with those areas of the act where Congress had decided to preempt state power. Nothing in Senator Morse's statement suggests that where Congress specifically recognized state power to legislate, it sought in any way to impose limitations on the remedy the state could provide. On the contrary, Senator Morse carefully noted that:
"Other sections of this bill refer specifically to the respective responsibilities of State and Federal Governments with regard to the subject matter covered by the bill. Nothing in this section 604 is to be construed as altering

those divisions of governmental responsibility as therein defined." Ibid.

6. See, e. g., 105 Cong.Rec. 6667 (daily ed. May 5, 1959) (statement of Senator Morse criticizing New York's legislation); 105 Cong.Rec. 5857–58 (daily ed. April 23, 1959) (statement of Senator Carroll approving the New York act).

7. In addition, the state statute in *Hill* not only served as an absolute prohibition against those listed from holding union office but in enforcing the statute the state enjoined the union from functioning as a labor organization under the NLRA. 325 U.S. at 543, 65 S.Ct. 1373. The legislation challenged in the instant case does not interfere with the LMRDA in a comparable manner; it is not alleged

## III.

 Appellant also argues vigorously that New York Labor Law § 723 constitutes a Bill of Attainder; it is, he says, an illegitimate "exercise in specification" since it is a legislative condemnation of a political group—characterized by appellant as "employer-man." Appellant places major reliance on United States v. Brown, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965) in which the Court held that Section 504 of the LMRDA—insofar as it bars any person from being an officer of a labor organization during or for five years after the termination of his membership in the Communist Party—constitutes a Bill of Attainder.

But in Brown the Court was careful to distinguish conflict-of-interest laws of which Section 723 is an example, and indicated that its holding was not contrary to Board of Governors of Federal Reserve System v. Agnew, 329 U.S. 441, 67 S.Ct. 411, 91 L.Ed. 408 (1947). In Agnew, the Court applied Section 32 of the Banking Act of 1933, 12 U.S.C. § 78, which, inter alia, barred any officer of a business enterprise engaged in certain financial transactions from serving as an officer of a member bank of the Federal Reserve System. And, the Brown Court stated the Section 32 of the Banking Act differed from Section 504 of the LMRDA on three grounds—all of which also serve to differentiate New York Labor Law § 723. First, Section 504 "inflicts its deprivation upon the members of a political group thought to present a threat to the national security." 381 U.S. at 453, 85 S.Ct. at 1717.[8] Second, the Banking Act "incorporates no judgment censuring or condemning any man or group of men. * * * [Congress] concluded that the concurrent holding of two designated positions would present a

temptation to *any* man—not just certain men or members of a certain political party." 381 U.S. at 453–454, 85 S.Ct. at 1717. (Emphasis in original.) Third, the Banking Act establishes an objective standard of conduct based on the determination that any person who held both positions "might well be tempted" to use his influence in one position to further his interest in the other. Ibid. We are of the view that New York Labor Law § 723 and Section 32 of the Banking Act deal with comparable interest conflict problems. In sum, we see nothing in Brown to indicate that New York is precluded from making—and acting upon—the eminently reasonable judgment that a person who represents both the employer and the employees at a collective bargaining table "might well be tempted" to use his position as a union officer to further his interests as an employer or that consciously or subconsciously he will be prevented from serving only the best interests of the union members.

## IV.

 Finally, appellant contends that the District Court should have summoned a statutory three-judge court, 28 U.S.C. §§ 2281, 2284. Swift & Co. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965), however, is clear authority that a three-judge court need not be convened in Supremacy Clause cases involving only federal-state statutory conflicts. Moreover, Fitzgerald's contention that a three-judge court should have heard his claim that the New York legislation constitutes a Bill of Attainder is without merit since it has long been settled that even when the challenge to a state statute is based on a substantive provision of the federal Constitution a three-judge court need not be convened if the claim is "insubstantial." Id. at 115, 86 S.Ct. 258. And, a conten-

that the state has threatened to enjoin the union from functioning as a labor organization and Fitzgerald has not been absolutely barred from holding union office. New York only demands that a person who has been elected to union office not serve two masters at the same time.

8. The Court in Brown was particularly solicitous of individual rights because it was concerned with an area of political association. See Note, The Supreme Court: 1964 Term, 79 Harv.L.Rev. 56, 122–123 (1965).

**408**

tion is insubstantial if it is obviously devoid of merit or if it is barred by decisions of the Supreme Court. Ex Parte Poresky, 290 U.S. 30, 32, 54 S.Ct. 3, 78 L.Ed. 152 (1933) (*per curiam*). We agree with the District Court that under the above criteria appellant's Bill of Attainder argument is insubstantial.

Affirmed.