31 N.Y.2d 350 (1972)
In the Matter of CC Lumber Co., Inc., Respondent,
v.
Waterfront Commission of New York Harbor, Appellant.
Court of Appeals of the State of New York.
Argued October 2, 1972.
Decided December 6, 1972.
Irving Malchman, William P. Sirignano and Leonard Picariello for appellant.
Israel G. Seeger for respondent.
Judges BERGAN, BREITEL and GIBSON concur with Judge JASEN; Judge SCILEPPI dissents and votes to affirm in a separate opinion in which Chief Judge FULD and Judge BURKE concur.
*352 JASEN, J.
The petitioner, CC Lumber Co., Inc., is a New York corporation engaged in supplying lumber to stevedores and steamship companies in New York harbor. In 1969 it acquired the assets of Court Carpentry and Marine Contractors Company, *353 Inc. (Court Carpentry), a marine carpentry firm. For some years prior to the merger of the companies, Joseph Lacqua was the sole stockholder of CC Lumber and served as president of both CC Lumber and Court Carpentry. Upon acquiring Court Carpentry in 1969, Joseph Lacqua received 30 shares of the common stock of the petitioner and became its president. An uncle, Leo Lacqua, formerly the sole stockholder of Court Carpentry, received 29 shares and became petitioner's secretary-treasurer.
Pursuant to an amendment to the Waterfront Commission Act (L. 1969, ch. 953, § 1), CC Lumber applied for a stevedore's license as a marine carpentry contractor. The commission denied the application, finding that the Lacquas lacked the requisite good character and integrity, citing three grounds: (1) that between October 1, 1966 and September 30, 1967, Court Carpentry overbilled its customers in excess of $74,000 representing 11,757 work hours; (2) that the Lacquas violated section 724 of the Labor Law by partaking in financial transactions with a union officer who represented some of their employees; and (3) that Leo Lacqua committed fraud at a commission interview. The Appellate Division annulled the commission's determination, on the law, one Justice dissenting, and the commission appeals.
The crucial issue before us is whether viewing the record as a whole, the determination of the commission is supported by substantial evidence. We conclude that it is.
In connection with the first charge, the commission found a discrepancy of 11,757 hours (representing more than $74,000) between hours billed by Court Carpentry to its customers and hours actually paid to its employees. The commission concluded that Court Carpentry intentionally billed its customers for more man hours than were actually provided.
The discrepancy between hours billed and hours paid is undisputed, and it appears from the record that the discrepancy did not result from an underpayment of wages to the employees. Billings were prepared from daily sign-off slips showing for each job the total hours and the work performed. These slips were prepared by Court Carpentry's foremen and signed by the port captain or other representative of the steamship company or stevedore for which the work was done. The foremen also prepared *354 daily time sheets containing the names of employees, their hours, and the ships they worked on. These sheets were used to prepare the payroll after which they were destroyed. Hour entries on the daily sign-off slips and the daily time sheets were supposed to match. Since the daily time sheets had been destroyed, it was not possible for the commission to compare them with the daily sign-off slips for discrepancies between the two in any particular job. Nevertheless, we are satisfied that the commission could reasonably infer that the total discrepancy indicated overbilling and that the Lacquas, as officers and shareholders of Court Carpentry, were chargeable with knowledge thereof.
Furthermore, the commission, as the sole arbiter of the issues of fact, the credibility of witnesses, and the weight to be attached to their evidence, could have reasonably rejected the proffered explanation of the discrepancy. (Matter of Avon Bar & Grill v. O'Connell, 301 N.Y. 150, 153.) Although there was testimony that on occasion the employees of CC Lumber performed work for Court Carpentry and that CC Lumber paid the employees for such work without reimbursement from Court Carpentry, a comparison of the discrepancy with the hours worked by the employees of CC Lumber during this period reveals the inadequacy of the explanation. The discrepancy of 11,757 hours broke down into 8,602 straight-time hours and 3,155 overtime hours. During the same time frame, the employees of CC Lumber worked a total of 22,379 hours, including only 1,171 overtime hours. Thus, it is apparent that on its face the explanation is insufficient to account for the discrepancy in overtime hours. Moreover, the explanation imports that Joseph Lacqua permitted his employees to spend more than half their time working for Court Carpentry during the fiscal year in question without reimbursement of any kind from Leo Lacqua (the sole stock-holder of Court Carpentry).
Finally, the hearing testimony on this issue contains contradictions. For example, John Amodio, the office manager for Court Carpentry and CC Lumber during the year in question, testified at the hearing that employees of CC Lumber would occasionally work for Court Carpentry and would be paid for such work by CC Lumber. However, when confronted with a *355 prior contrary statement, made by him in a commission interview, to the effect that on such occasions Court Carpentry paid CC Lumber's employees for the work done on its behalf, Amodio admitted that the interview testimony refreshed his recollection.
It should also be noted that the commission could have reasonably rejected the possibility of a mathematical or bookkeeping error as explaining the discrepancy. As previously noted, the daily sign-off slips were transposed into billings and the daily time sheets were transposed into payroll. Both the daily sign-off slips and the daily time sheets were prepared at the end of each day by the same person  the job foreman. Both were supposed to show the hours worked and were to correspond with each other. Since it appears from the record that the discrepancy between hours billed and hours paid to employees did not result from an underpayment of wages to the employees, the commission could have reasonably concluded that the daily sign-off slips and the daily time sheets did not correspond and that the discrepancy was attributable to intentional overbilling. Nor was the commission required to credit the testimony offered by petitioners  and impeached at the hearing  that the sign-off slips accurately reflected the hours worked on each job. (Matter of Avon Bar & Grill v. O'Connell, 301 N.Y. 150, supra.)
Turning to the third charge[1], the commission found that the Lacquas lacked good character in that they violated section 724 of the Labor Law[2] by partaking in financial transactions with an officer of a labor organization representing their employees contrary to the latter's fiduciary obligations as a union officer under section 723 of the Labor Law.[3] Again, in our view, the commission's determination is supported by substantial evidence.
*356 The commission found that the Lacquas, together with Anthony Scotto, a vice-president of the International Longshoremen's Association (ILA)[4], negotiated a loan for $200,000 to purchase the Englewood Golf and Pool Club, Inc. The loan was negotiated on behalf of Newbrook Enterprises, Inc. (Newbrook), a real estate holding corporation owned by the Lacquas and Marion Scotto, the wife of Anthony Scotto and niece of Leo Lacqua. There is ample evidence in the record from which the commission could have concluded that Anthony Scotto was actively involved in these transactions as an interested party and a principal actor on behalf of the Lacquas, and that he stood to benefit therefrom, directly or indirectly, all in violation of his fiduciary obligations as a labor leader. (Labor Law, § 723.) Further, the commission could have concluded that the Lacquas, as principals in the loan transactions, knowingly participated in or induced Scotto's illegal acts. (Labor Law, § 724.)
Anthony Scotto actively participated in the preliminary discussions regarding the loan, the initial loan negotiations with the Kings County Lafayette Trust, and the subsequent negotiations increasing the loan to $245,000. The bank's negotiator, a vice-president, was aware that Scotto was an ILA officer and that the ILA had a considerable number of accounts with the bank. Admittedly, the ILA accounts were a factor considered in making the loan. Furthermore, after Newbrook acquired the Englewood Golf and Pool Club, Inc., Anthony Scotto became the president of the Englewood Country Club, an unincorporated association that rented the Englewood facility from Englewood Golf and Pool Club, Inc.
The clear policy of the Labor and Management Improper Practices Act (L. 1959, ch. 451; Labor Law, art. 20-A) is to protect union members from those few unscrupulous labor leaders who would subvert the interests of their members for personal gain. *357 (See, e.g., Governor's Memorandum accompanying L. 1959, ch. 451; Labor Law, § 720.) The law demands a clear line of financial demarcation between labor leaders and employers with whom they deal on behalf of their members. (Fitzgerald v. Catherwood, 388 F.2d 400 [2d Cir., 1968].) Moreover, a union official holds a position of trust and the fiduciary principle must guide his every action. He breaches that trust and compromises his loyalty when he stands to benefit, directly or indirectly, from involvement in the financial affairs of the employers of the union members he serves. (Labor Law, §§ 722, 723; cf. L. 1953, ch. 882, pt. I, § 1, art. I, § 3; Labor-Management Reporting and Disclosure Act of 1959 [U. S. Code, tit. 29, § 401 et seq.]; H. R. Rep. No. 741, 1959 U. S. Code, Cong. and Admin. News, pp. 2424, 2479-2480.)
We conclude, therefore, that there was sufficient evidence for the commission to find that Anthony Scotto breached his fiduciary obligation as a union officer under section 723 of the Labor Law, and that Joseph Lacqua and Leo Lacqua, as principals in the loan transactions in question, knowingly participated in or induced Scotto's illegal acts in violation of section 724 of the Labor Law.
The fourth charge is based on the contention that Leo Lacqua committed fraud in a commission interview. Specifically, Lacqua disavowed any knowledge of alleged activities of Anthony Scotto on behalf of Newbrook Enterprises, Inc.
There is ample evidence in the record from which the commission could have concluded that between 1959 and 1966 Anthony Scotto acted on behalf of Newbrook Enterprises, Inc., of which Leo Lacqua was then president and an equal one-third stock-holder. For example, Scotto negotiated loans for Newbrook, applied for mortgage loans, signed forms on behalf of Newbrook for the Department of Buildings of New York City, and successfully bid on certain real estate on behalf of Newbrook.
The record also contains substantial evidence from which the commission reasonably could have inferred that Leo Lacqua had actual knowledge of Scotto's activities on behalf of Newbrook. Leo Lacqua was president and a principal stockholder of Newbrook, and was sufficiently interested and involved in the management of Newbrook's relatively modest property holdings to collect rents and to participate in shareholder meetings. Leo *358 Lacqua also executed various stockholder consents and guarantees related to mortgages and loans arranged by Anthony Scotto on behalf of Newbrook during 1959 and 1960. Finally, Joseph Lacqua discussed the purchase of the Englewood Golf and Pool Club, Inc. with Leo Lacqua and the Scottos, and Leo Lacqua and Anthony Scotto guaranteed the loan used to purchase the club. In view of these facts, the commission was not required to credit testimony to the effect that Leo Lacqua was not aware of the details of Newbrook's business or that he left the management of Newbrook to Joseph Lacqua and Marion Scotto. (Matter of Avon Bar & Grill v. O'Connell, 301 N.Y. 150, supra; cf. Matter of Halloran v. Kirwan, 28 N Y 2d 689, 690 [BREITEL, J., dissenting].)
It would be difficult or impossible for the Legislature to lay down a definite, comprehensive rule by which the commission could measure an applicant's character and integrity. Of necessity such determinations are addressed to the sound discretion of the commission. Where, as here, the commission has made a finding of personal unfitness, our inquiry is limited to the question whether there is substantial evidence to support the determination or, on the other hand, whether the determination is tantamount to an arbitrary or capricious abuse of discretion. (Matter of Barton Trucking Corp. v. O'Connell, 7 N Y 2d 299.)
The Waterfront Commission of New York Harbor shares the enormous responsibility of policing the docks, rooting out corruption, and promoting an equitable, dignified and safe-working environment there. (L. 1953, ch. 882, pt. I, § 1, art. I, § 1; art. IV.) In creating the commission, the Legislature recognized that the methods used for hiring waterfront labor and the conduct of the business of public loading and stevedoring were unjust and degrading to the worker, fostered waterfront crime and corruption, and adversely affected the handling of port commerce. (L. 1953, ch. 882, pt. I, § 1, art. I.) With respect to stevedores, it was found that they had "engaged in corrupt practices to induce their hire by carriers of freight by water and to induce officers and representatives of labor organizations to betray their trust to the members of such labor organizations." (L. 1953, ch. 882, pt. I, § 1, art. I, § 3.) Accordingly, the Legislature gave to the commission the power to regulate the occupations of stevedores, pier superintendents, hiring agents, pier watchmen and longshoremen.
*359 The Report of the New York State Crime Commission on the Port of New York (N. Y. Legis. Doc., 1953, No. 70), which preceded enactment of the Waterfront Commission Act (L. 1953, ch. 882), found that steamship companies and stevedores were making corrupt payments to labor officials. The quid pro quo of these payments was labor peace, or a minimum of labor difficulty on the piers. In addition, it was found that many labor leaders participated in various business enterprises incompatible with their duties to the members of their unions.
In 1959, the Legislature enacted the Labor and Management Improper Practices Act (L. 1959, ch. 451), which explicitly proscribed these activities. The Legislature declared it to be the policy of the State that labor "officers and agents shall not acquire financial interests which interfere or tend to interfere with the faithful performance of their responsibility to the labor organization", and that "employers * * * shall not participate in or induce violations of such fiduciary obligation by officers and agents of labor organizations." (Labor Law, § 720.)
We deem it appropriate, therefore, that the commission in part grounded its denial of a stevedore's license on violations of the Labor Law dealing with the fiduciary obligations of union officers. (Labor Law, §§ 723, 724.) In our view, the commission was amply justified in concluding that the conduct of Joseph Lacqua and Leo Lacqua was inconsistent with the standard of good character and integrity required of a stevedore licensee.
We also agree that the findings of overbilling and fraud committed in a commission interview are sufficient to support the conclusion that the Lacquas lacked the requisite good character and integrity. In this regard it should be noted that fraud in securing a license, or a licensee's failure to maintain a true and accurate account of receipts and disbursements would support a revocation or suspension of a stevedore license (L. 1953, ch. 882, pt. I, § 1, art. VI, § 6), and should certainly bear, therefore, on the character and integrity of an applicant for a license. (L. 1953, ch. 882, pt. I, § 1, art. VI, § 3, subd. [b].)
The Legislature has created an expert administrative body to deal with the especially difficult problems of crime and corruption on the waterfront, to promote the interests of port workers, and to further port commerce. If it is to accomplish these goals, it requires a full measure of discretion in licensing stevedores *360 and others. Its determinations should, therefore, be upheld unless they are unsupported by substantial evidence or are otherwise arbitrary or capricious. Under all the circumstances of this case, the commission's determination is amply supported.
Accordingly, the order of the Appellate Division should be reversed and the determination of the commission reinstated.
SCILEPPI, J. (dissenting).
I dissent and vote to affirm.
The burden of establishing that the principals were not qualified by character and integrity, in the first instance rests with the commission. Undoubtedly, more often than not, proof of wrongdoing will be based on inferences drawn from proven facts (White v. Benjamin, 150 N.Y. 258, 265); and, as a matter of sound administrative policy, where, from the evidence adduced either of two conflicting inferences may reasonably be drawn, the duty of weighing the evidence and choosing between equally compelling alternatives is a matter for the agency or commission, not the courts (Matter of Stork Rest. v. Boland, 282 N.Y. 256, 267; see, also, Matter of Kilgus v. Board of Estimate of City of N. Y., 308 N.Y. 620, 627). Nevertheless, though we will not sift through all the evidence, the inferences drawn must be reasonable in light of all the attending facts and circumstances: "A mere scintilla of evidence sufficient to justify a suspicion is not sufficient to support a finding upon which legal rights and obligations are based" (Matter of Stork Rest. v. Boland, 282 N.Y. 256, 267, 273-274, supra); rather, the finding must be the product of "`such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" (id., at p. 274, quoting Edison Co. v. Labor Bd., 305 U. S. 197, 229). Our task then, is not to determine what evidence preponderates, but whether established facts support the inferences drawn. Viewed in terms of that standard, the evidence adduced below is insufficient.
In the first charge the Lacquas were found to lack good character and integrity because Court Carpentry allegedly overbilled its customers in excess of $74,000, representing some 11,757 hours of work. In point of fact, there is no direct evidence to support the charge of overbilling; instead, we are referred to a mathematical discrepancy from which the charge was purportedly *361 inferred. The commission's auditor could only testify that an audit of Court Carpentry's books showed "a discrepancy between hours billed to customers and hours paid to employees of 11,757 hours", without any satisfactory explanation for the difference. This discrepancy can be explained, in the commission's words, by one of two things: "Either the employees [of Court Carpentry] were not paid for 11,757 hours that they worked or the customers were billed for 11,757 hours for which they did not receive work * * * either they shorted the employees or overbilled the customers".
Surely, both prospects are well within the realm of possibility, but absent a further showing that customers had lodged complaints of overbilling, or that individual employees had complained of uncompensated services, or, for that matter, that agents of various steamship companies, or the companies themselves for their own reasons, had a hand in these alleged shortchanges, the fact of a mathematical discrepancy alone is not of sufficient probative value to support either inference. Perhaps the discrepancy was only that, a mathematical error; so too, it may only suggest that different employees worked "off the books;" or further, as one of the Lacquas suggested, perhaps the discrepancy is partly explained by Court Carpentry's haphazard policy of using CC Lumber yardmen on ships while leaving them on the CC payroll: implying further that the discrepancy was the product of a number of different factors. A multitude of possibilities do suggest themselves, including the one considered and apparently rejected, but certainly never conceded to, by the commission that certain employees were not paid for work done. And, under the circumstances, the petitioner, contrary to the commission's urgings, apparently acceded to by the court, was under no burden of coming forward with countervailing evidence to explain the discrepancy. Petitioner had been charged with intentional overbilling and it was incumbent upon the commission to sustain that charge on the evidence adduced. As it is, there has been a complete failure of proof on the charge and we return to where we began with the fact of a discrepancy and nothing more. There is just no substantial evidence to support the conclusion that the discrepancy was the product of some improper business practice and the finding to that effect cannot be credited (Matter of Erin Wine & Liq. Store v. O'Connell, 283 App. Div. 443, affd. 307 N.Y. 768; *362 Matter of Kopec v. Buffalo Brake Beam-Acme Steel & Malleable Iron Works, 304 N.Y. 65; 32A C. J. S., Evidence, § 1021, subd. [b], pp. 652-654).
The commission, as fact finder, could, of course, reasonably have rejected any or all of the several reasons tendered by the Lacquas to explain away the discrepancies but, in so doing, it was not at liberty to substitute the truly untenable assumption that the disparity was attributable to some wrongdoing, or, further, to infer that there were actually instances of intentional overbilling.
The third charge, based on an asserted violation of sections 723 and 724[*] of the Labor Law  which the commission has sustained  alleges that the Lacquas, with Anthony Scotto, now vice-president of the International Longshoremen's Association (ILA) and the husband of Marion Scotto, a niece of Leo Lacqua, had negotiated a loan with Kings County Lafayette Trust Company on behalf of Newbrook Enterprises, Inc., a family real estate holding corporation in which Marion Scotto and the Lacquas are equal shareholders. The loan was guaranteed by each shareholder, by CC Lumber and Court Carpentry and, in view of bank policy requiring the spouses of substantial stockholders of a borrowing corporation to sign separate personal guarantees, by Anthony Scotto and Mary Lacqua, Leo's wife. The evidence further shows that the bank's negotiator was aware of Scotto's involvement with the ILA and that the ILA was a large depositor with the bank. More importantly, however, there is no showing that Scotto had used his labor affiliations as leverage in the loan negotiations and a review of the evidence demonstrates that, despite file notations made solely on the bank's own initiative and for internal reference, the loan was granted based upon the *363 applicant's own financial history and dealings with the bank. Scotto's participation was for his wife's benefit and the guarantee which he signed, merely a formal requirement of the bank.
Whatever our view of Scotto's activities on behalf of Newbrook, even though substantial, we are concerned with whether a predicate violation under section 723 of the Labor Law has been established: namely, whether, on these facts, Scotto's interest, through his wife, in this wholly separate, family-owned corporation of which the Lacquas were, coincidentally, also principals, constituted a breach of his fiduciary obligations owing to the ILA. To be sure, the fact of his involvement in the corporate affairs of Newbrook, explored at length in the court's opinion, is relevant, but only insofar as it points to the extent of his interest  which on the basis of the evidence adduced must now be taken as real, albeit indirect  and further defines the Lacquas continued acquiescence in the involvement. Real though the interest may be, it must, nevertheless, also be "in any business or transaction of * * * an employer whose employees his labor organization represents" (Labor Law, § 723), before a breach of the statutory prohibition is made out. That is certainly not this case, since Scotto had no interest in CC Lumber, nor were the loan negotiations undertaken on its behalf, and there is no evidentiary support for the proposition that Newbrook Enterprises was a sham corporation organized for the purpose of circumventing the Labor Law proscriptions against "direct or indirect interests".
But even were we to ignore the fact of Newbrook's status as a third corporate entity and agree that business relations with corporate principals suffices as an indirect interest, the Appellate Division was correct in holding that these apparently innocent transactions among close relatives, and undertaken openly on behalf of a small family corporation, are not the sort proscribed by the Labor Law provisions. This is not a case where a union official's conduct is explainable only in terms of some surreptitious attempt to avoid the responsibilites which the law assigns. And what is deemed objectionable amounts to no more than an ordinary incident of close family ties. Under the circumstances, it would appear just as reasonable to base the denial of a license on the fact that one of the licensees  or for that matter, a sister of the licensees  is related to a labor leader.
*364 As it is, the present charges are raised in an independent licensing proceeding, and were we to conclude that Scotto's interest in Newbrook Enterprises was violative of section 723, the fact of a technical transgression, although acquiesced in by petitioner's principals, does not establish that they lacked good character or integrity within the meaning of the Waterfront Commission Act. While such blanket interdictions against potential conflicts of interest might well be essential to insure against corruption in labor relations, absent some further showing of intentional wrongdoing or efforts at purposeful circumvention of the law, or that either the employer or the union official stood to gain at the expense of labor, the proscribed interest cannot be invoked as an automatic bar to a license in a separate licensing procedure. Sections 723 and 724 have their own enforcement provisions, which include criminal as well as civil sanctions for established breaches of fiduciary duties. There is no compelling necessity that additional sanctions be imposed by spontaneously defining good character or integrity to exclude those alleged to have committed technical violations of the Labor Law.
Finally, the charge that Leo Lacqua committed "fraud" at an earlier commission interview when he allegedly testified that Anthony Scotto had never acted on behalf of Newbrook and the evidence establishes that Scotto had, in fact, participated in loan negotiations and, with others, had personally guaranteed the note, cannot be sustained. Taken contextually, the representation made by Mr. Lacqua was that Scotto had no say in the corporate policy of Newbrook but acted for his wife's benefit, since Newbrook was entirely a Lacqua family affair, and that he had never used his influence to advance the interests of CC Lumber or Court Carpentry in contract negotiations with steamship companies.
In sum, the evidentiary showing relied upon by the commission was unusually weak. Though corruption on the waterfront presents many special problems, denial of a license to operate must be supported by a firm factual foundation, not suspicion or surmise. Measured in terms of all the evidence adduced, the fact of close family relations, an indirect interest in a third corporation and the candor with which the principals had conducted themselves throughout, there has been no breach of fiduciary obligations *365 owing the ILA. Even if there were, a per se rule, as advanced by the court, would be wholly out of place where the underlying allegation in a licensing procedure is that the principals lacked "good character and integrity", connoting, as that does, a degree of moral turpitude or some conscious legal dereliction.
Accordingly, the order appealed from should be affirmed.
Order reversed, with costs, and the determination of the commission reinstated.
NOTES
[1] The second charge, based on alleged violations of sections 722, 723 and 724 of the Labor and Management Improper Practices Act (Labor Law, art. 20-A), did not enter into the commission's determination and is not before us on this appeal.
[2] Section 724 of the Labor Law provides in pertinent part: "No employer * * * shall knowingly participate in or induce any conduct or act which violates any of the obligations of any officer or agent of a labor organization provided in section seven hundred twenty-three."
[3] Section 723 of the Labor Law provides in pertinent part:

"1. [I]t shall constitute a violation of his fiduciary obligation for an officer or agent of a labor organization:
"(a) To have, directly or indirectly, any financial interest in any business or transaction of either an employer whose employees his labor organization represents or seeks to represent for purposes of collective bargaining, or an employer who is in the same industry as such an employer".
[4] Anthony Scotto was an officer of the ILA, which negotiated the industry collective bargaining agreement with the New York Shipping Association. He also was president of ILA Local 1814, which represented some of the employees of Court Carpentry.
[*] Section 723 of the Labor Law provides in part:

"1. * * * [I]t shall constitute a violation of his fiduciary obligation for an officer or agent of a labor organization:
"(a) To have, directly or indirectly, any financial interest in any business or transaction of either an employer whose employees his labor organization represents or seeks to represent for purposes of collective bargaining, or an employer who is in the same industry as such an employer".
Section 724 of the Labor Law provides in part:
"No employer * * * shall knowingly participate in or induce any conduct or act which violates any of the obligations of any officer or agent of a labor organization provided in section seven hundred twenty-three."