*352 Jasen, J.
The petitioner, CC Lumber Co., Inc., is a New York corporation engaged in supplying lumber to stevedores and steamship companies in New York harbor. In 1969 it acquired the assets of Court Carpentry and Marine Contractors Company, *353 Inc. (Court Carpentry), a marine carpentry firm. For some years prior to the merger of the companies, Joseph Lacqua was the sole stockholder of CC Lumber and served as president of both CC Lumber and Court Carpentry. TJpon acquiring Court Carpentry in 1969, Joseph Lacqua received 30 shares of the common stock of the petitioner and became its president. An uncle, Leo Lacqua, formerly the sole stockholder of Court Carpentry, received 29 shares and became petitioner’s secretary-treasurer.
Pursuant to an amendment to the Waterfront Commission Act (L. 1969, ch. 953, § 1), CC Lumber applied for a stevedore’s license as a marine carpentry contractor. The commission denied the application, finding that the Lacquas lacked the requisite good character and integrity, citing three grounds: (1) that between October 1, 1966 and September 30, 1967, Court Carpentry overbilled its customers in excess of $74,000 representing 11,757 work hours; (2) that the Lacquas violated section 724 of tíie Labor Law by partaking in financial transactions with a union officer who represented some of their employees; and (3) that Leo Lacqua committed fraud at a commission interview. The Appellate Division annulled the commission’s determination, on the law, one Justice dissenting, and the commission appeals.
The crucial issue before us is whether viewing the record as a whole, the determination of the commission is supported by substantial evidence. We conclude that it is.
In connection with the first charge, the commission found a discrepancy of 11,757 hours (representing more than $74,000) between hours billed by Court Carpentry to its customers and hours actually paid to its employees. The commission concluded that Court Carpentry intentionally billed its customers for more man hours than were actually provided.
The discrepancy between hours billed and hours paid is undisputed, and it appears from the record that the discrepancy did not result from an underpayment of wages to the employees. Billings were prepared from daily sign-off slips showing for each job the total hours and the work performed. These slips were prepared by Court Carpentry’s foremen and signed by the port captain or other representative of the steamship company or stevedore for which the work was done. The foremen also pre *354 pared daily time sheets containing the names of employees, their hours, and the ships they worked on. These sheets were used to prepare the payroll after which they were destroyed. Hour entries on the daily sign-off slips and the daily time sheets were supposed to match. Since the daily time sheets had been destroyed, it was not possible for the commission to compare them with the daily sign-off slips for discrepancies between the two in any particular job. Nevertheless, we are satisfied that the commission could reasonably infer that the total discrepancy indicated overbilling and that the Lacquas, as officers and shareholders of Court Carpentry, were chargeable with knowledge thereof.
Furthermore, the commission, as the sole arbiter of the issues of fact, the credibility of witnesses, and the weight to be attached to their evidence, could have reasonably rejected the proffered explanation of the discrepancy. (Matter of Avon Bar & Grill v. O’Connell, 301 N. Y. 150,153.) Although there was testimony that on occasion the employees of CC Lumber performed work for Court Carpentry and that CC Lumber paid the employees for such work without reimbursement from Court Carpentry, a comparison of the discrepancy with the hours worked by the employees of CC Lumber during this period reveals the inadequacy of the explanation. The discrepancy of 11,757 hours broke down into 8,602 straight-time hours and 3,155 overtime hours. During the same time frame, the employees of CC Lumber worked a total of 22,379 hours, including only 1,171 overtime hours. Thus, it is apparent that on its face the explanation is insufficient to account for the discrepancy in overtime hours. Moreover, the explanation imports that Joseph Lacqua permitted his employees to spend more than half their time working for Court Carpentry during the fiscal year in question without reimbursement of any kind from Leo Lacqua (the sole stockholder of Court Carpentry).
Finally, the hearing testimony on this issue contains contradictions. For example, John Amodio, the office manager for Court Carpentry and CC Lumber during the year in question, testified at the hearing that employees of CC Lumber would occasionally work for Court Carpentry and would be paid for such work by CC Lumber. However, when confronted with a *355 prior contrary statement, made by him in a commission interview, to the effect that on such occasions Court Carpentry paid CC Lumber’s employees for the work done on its behalf, Amodio admitted that the interview testimony refreshed his recollection.
It should also be noted that the commission could have reasonably rejected the possibility of a mathematical or bookkeeping error as explaining the discrepancy. As previously noted, the daily sign-off slips were transposed into billings and the daily time sheets were transposed into payroll. Both the daily sign-off slips and the daily time sheets were prepared at the end of each day by the same person — the job foreman. Both were supposed to show the hours worked and were to correspond with each other. Since it appears from the record that the discrepancy between hours billed and hours paid to employees did not result from an underpayment of wages to the employees, the commission could have reasonably concluded that the daily sign-off slips and the daily time sheets did not correspond and that the discrepancy was attributable to intentional overbilling. Nor was the commission required to credit the testimony offered by petitioners — and impeached at the hearing — -that the sign-off slips accurately reflected the hours worked oñ each job. (Matter of Avon Bar & Grill v. O’Connell, 301 N. Y. 150, supra.)
Turning to the third charge[1], the commission found that the Lacquas lacked good character in that they violated section 724 of the Labor Law[2] by partaking in financial transactions with an officer of a. labor organization representing their employees contrary to the latter’s fiduciary obligations as a union officer under section 723 of the Labor Law.[3] Again, in our view, the commission’s determination is supported by substantial evidence.
*356 The commission found that the Lacquas, together with Anthony Scotto, a vice-president of the International Longshoremen’s Association (ILA)[4], negotiated a loan for $200,000 to purchase the Englewood Golf and Pool Club, Inc. The loan was negotiated on behalf of Newbrook Enterprises, Inc. (Newbrook), a real estate holding corporation owned by the Lacquas and Marion Scotto, the wife of Anthony Scotto and niece of Leo Lacqua. There is ample evidence in the record from which the commission could have concluded that Anthony Scotto was actively involved in these transactions as an interested party and a principal actor on behalf of the Lacquas, and that he stood to benefit therefrom, directly or indirectly, all in violation of his fiduciary obligations as a labor leader. (Labor Law, § 723.) Further, the commission could have concluded that the Lacquas, as principals in the loan transactions, knowingly participated in or induced Scotto’s illegal acts. (Labor Law, § 724.)
Anthony Scotto actively participated in the preliminary discussions regarding the loan, the initial loan negotiations with the Kings County Lafayette Trust, and the subsequent negotiations increasing the loan to $245,000. The bank’s negotiator, a vice-president, was aware that Scotto was an ILA officer and that the ILA had a considerable number of accounts with the bank. Admittedly, the ILA accounts were a factor considered in making the loan. Furthermore, after Newbrook acquired the Englewood Golf and Pool Club, Inc., Anthony Scotto became the president of the Englewood Country Club, an unincorporated association that rented the Englewood facility from Englewood Golf and Pool Club, Inc.
The clear policy of the Labor and Management Improper Practices Act (L. 1959, ch. 451; Labor Law, art. 20-A) is to protect union members from those few unscrupulous labor leaders who would subvert the interests of their members for personal gain. *357 (See, e.g., Governor’s Memorandum accompanying L. 1959, ch. 451; Labor Law, § 720.) The law. demands a clear line of financial demarcation between labor leaders and employers with whom they deal on behalf of their members. (Fitzgerald v. Catherwood, 388 F. 2d 400 [2d Cir., 1968].) Moreover, a union official holds a position of trust and the fiduciary principle must guide his every action. He breaches that trust and compromises his loyalty when he stands to benefit, directly or indirectly, from involvement in the financial affairs of the eihployers of the uniofi members he serves. (Labor Law, §§ 722, 723; cf. L. 1953, ch. 882, pt. I, § 1, art. I, § 3; Labor-Management Reporting and Disclosure Act of 1959 [U. S. Code, tit. 29, § 401 et seq.]; H. R. Rep. No. 741, 1959 U. S. Code, Cong. and Admin. News, pp. 2424, 2479-2480.)
We conclude, therefore, that there was sufficient evidence for the commission to find that Anthony Scotto breached his fiduciary obligation as a union officer under section 723 of the Labor Law, and that Joseph Lacqua and Leo Lacqua, as principals in the loan transactions in question, knowingly participated in or induced Scotto’s illegal acts in violation of section 724 of the Labor Law.
The fourth charge is based on the contention that Leo Lacqua committed frauddn a commission interview. Specifically, Lacqua disavowed any knowledge of alleged activities of Anthony Scotto on behalf of Newbrook Enterprises, Inc.
There is ample evidence in the record from which the commission could have concluded that between 1959 and 1966 Anthony Scotto acted on behalf of Newbrook Enterprises, Inc., of which Leo Lacqua was then president and an equal one-third stockholder. For example, Scotto negotiated loans for Newbrook, applied for mortgage loans, signed forms on behalf of Newbrook for the Department of Buildings of New York City, and successfully bid on certain real estate on behalf of Newbrook.
The record also contains substantial evidence from which the commission reasonably could have inferred that Leo Lacqua had actual knowledge of Scotto’s activities on behalf of Newbrook. Leo Lacqua was president and a' principal stockholder of New-brook, and was sufficiently interested and involved in the management of Newbrook’s relatively modest property holdings to collect rent§ and to participate in shareholder meetings. Leo *358 Lacqua also executed, various stockholder consents and guarantees related to mortgages and loans arranged by Anthony Scotto on behalf of Newbrook during 1959 and 1960. Finally, Joseph Lacqua discussed the purchase of the Englewpod Golf and Pool Club, Inc. with Leo Lacqua and the Scottos, and Leo Lacqua and Anthony Scotto guaranteed the loan used to purchase the club. In view of these facts, the commission was not required to credit testimony to the effect that Leo Lacqua was not aware of the details of Newbrook’s business or that he left the management of Newbrook to Joseph Lacqua and Marion Scotto. (Matter of Avon Bar & Grill v. O’Connell, 301 N. Y. 150, supra; cf. Matter of Halloran v. Kirwan, 28 N Y 2d 689, 690 [Breitel, J., dissenting].)
It would be difficult or impossible for the Legislature to lay down a definite, comprehensive rule by which the commission could measure an applicant’s character and integrity. Of necessity such determinations are addressed to the sound discretion of the commission. Where, as here, the commission has made a finding of personal unfitness, our inquiry is limited to the question whether there is substantial evidence to support the determination or, on the other hand, whether the determination is. tantamount to an arbitrary or capricious abuse of discretion. (Matter of Barton Trucking Corp. v. O’Connell, 7 N Y 2d 299.)
The Waterfront Commission of New York Harbor shares the enormous responsibility of policing the docks, rooting out corruption, and promoting an equitable, dignified and safe-working environment there. (L. 1953, ch. 882, pt. I, § 1, art. I, § 1; art. IV.) In creating the commission, the Legislature recognized that the methods used for hiring waterfront labor and the conduct of the business of public loading and stevedoring were unjust and degrading to the worker, fostered waterfront crime and corruption, and adversely affected the handling of port commerce. (L. 1953, ch. 882, pt. I, § 1, art. I.) With respect to stevedores, it was found that they had ‘‘ engaged in corrupt practices to induce their hire by carriers of freight by water and to induce officers and representatives of labor organizations to betray their trust to the members of such labor organizations. ’ ’ (L. 1953, ch. 882, pt. I, § 1, art. I, § 3.) Accordingly, the Legislature gave to the commission the power to regulate the occupations of stevedores, pier superintendents, hiring agents, pier watchmen and longshoremen.
*359 The Report of the New York State Crime Commission on the Port of New York (N. Y. Legis. Doc., 1953, No. 70), which preceded enactment of the Waterfront Commission Act (L. 1953, ch. 882), found that steamship companies and stevedores were making corrupt payments to labor officials. The quid pro quo of these payments was labor peace, or a minimum of labor difficulty on the piers. In addition, it was found that many labor leaders participated in various business enterprises incompatible with their duties to the members of their unions.
In 1959, the Legislature enacted the Labor and Management Improper Practices Act (L. 1959, ch. 451), which explicitly proscribed these activities. The Legislature declared it to be the policy of the State that labor ' ‘ officers and agents shall not acquire financial interests which interfere or tend to interfere with the faithful performance of their responsibility to the labor organization”, and that “ employers * * * shall not participate in or induce violations of such fiduciary obligation by officers and agents of labor organizations. ” (Labor Law, § 720.)
We deem it appropriate, therefore, that the commission in part grounded its denial of a stevedore’s license on violations of the Labor Law dealing with the fiduciary obligations of union officers. (Labor Law, §§ 723, 724.). In our view, the commission was amply justified in concluding that the conduct of Joseph Lacqua and Leo Lacqua was inconsistent with the standard of good character and integrity required of a stevedore licensee.
We also agree that the findings of overbilling and fraud committed in a commission interview are sufficient to support the conclusion that the Lacquas lacked the requisite good character and integrity. In this regard it should be noted that fraud in securing a license, or a licensee’s failure to maintain a true and accurate account of receipts and disbursements would support a revocation or suspension of a stevedore license (L. 1953, ch. 882, pt. I, § 1, art. VI, § 6), and should certainly bear, therefore, on the character and integrity of an applicant for a license. (L. 1953, ch. 882, pt. I, § 1, art. VI, § 3, subd. [b].)
The Legislature has created an expert administrative body to deal with the especially difficult problems of crime and corruption on the waterfront, to promote the interests of port workers, and to further port commerce. If it is to accomplish these goals, jt requires a full measure of discretion in licensing steve *360 dores and others. Its determinations should, therefore, be upheld unless they are unsupported by substantial evidence or are otherwise arbitrary or capricious. Under all the circumstances of this case, the commission’s determination is amply supported.
Accordingly, the order of the Appellate Division should b? reversed and the determination of the commission reinstated.

. The second charge, based on alleged violations of sections 722, 723 and 724 of the Labor and Management Improper Practices Act (Labor Law, art. 20-A), did not enter into the commission’s determination and is not before us on this appeal.

. Section 724 of the Labor Law provides in pertinent part: “No employer * * * shall knowingly participate in or induce any conduct or act which violates any of the obligations of any officer or agent of a labor organization provided in section seven hundred twenty-three.”

. Section 723 of the Labor Law provides in pertinent part:
“1. [I]t shall constitute a violation of his fiduciary obligation for an officer or agent of a labor organization:
*356 “ (a) To have, directly or indirectly, any financial interest in any business or transaction of either an employer whose employees his labor organization represents or seeks to represent for purposes of collective bargaining, or an employer who is in the same industry as such an employer ”,

. Anthony Scotto was an officer of the ILA, which negotiated the industry collective bargaining agreement with the New York Shipping Association. He also was president of ILA Local 1814, which represented some of the employees of Court Carpentry.