MEMORANDUM OPINION AND ORDER
 

 HAIGHT, Senior District Judge.
 

 This case is before the Court on remand from the Court of Appeals.
 
 See Doyle v. Kamenkowitz,
 
 114 F.3d 371 (2d Cir.1997). At issue is the right of former officers of a labor union to recover from that union attorney’s fees incurred by those former officers in successfully defending against claims for wrongdoing asserted against them by the union and its successor officers.
 

 The union refuses to pay its former officers’ attorney’s fees. This Court held, in
 
 Doyle v. Turner,
 
 886 F.Supp. 399 (S.D.N.Y.1995), that § 501(b) of the Labor-Management Reporting Disclosure Act of 1959 (“LMRDA”), 29 U.S.C. § 401
 
 el seq.,
 
 could be invoked by the former union officers to compel the union to pay their attorney’s fees.
 

 In a case of first impression in this Circuit, the Court of Appeals reasoned that while § 501(b) has been judicially construed “so as not to bar payment of successful defendants’ legal expenses out of the union’s coffers, ... neither section 501 nor any general equitable principle compels a union to grant reimbursement.” 114 F.3d at 375, 376. The Court of Appeals remanded the case to this Court for determination of whether an award of the defendant officers’ attorney’s fees may be based upon “other grounds or rationales,”
 
 id.
 
 at 379.
 

 The former union officers in question
 
 [1]
 
 now reassert their claims for union reimbursement of their attorneys fees. The union again resists any payment.
 

 I.
 

 The facts and circumstances of this prolonged litigation are set forth in the decisions of the Court of Appeals and this Court previously cited, together with earlier opinions of this Court whose citations the Court of Appeals collected at 114 F.3d at 373 n. 1. Familiarity with all these opinions is assumed. For present purposes, it is sufficient to say that the defendants identified in footnote 1, all former officers of plaintiff Local 1199, Drug, Hospital and Health Care Employees Union, RWDSU, AFL-CIO (the “Union”), succeeded in obtaining judgments dismissing all the plaintiffs’ claims of wrongdoing against them, and also succeeded on their counterclaims alleging that the Union was unlawfully withholding severance pay and vacation benefits from them. In all these successful litigation efforts, the former Union officers in question were represented by Gareth W. Stewart, Esq., and attorneys associated with him. Mr. Stewart’s fees and expenses underlie the present claims against the Union for reimbursement.
 

 In their initial fee application before this Court, the defendants in question (hereinafter “the defendants”) asserted three bases for recovery: (1) § 501(b) of the LMRDA, as interpreted by caselaw; (2) the “bad faith” exception to the usual American Rule in respect of attorney’s fees; and (3) provisions of New York law applicable to the reimbursement of corporate officers and directors who have been vindicated in litigation against them.
 
 See
 
 886 F.Supp. at 400. I held that the defendants were entitled to claim reimburse
 
 *314
 
 ment of attorney’s fees from the Union “under the LMRDA and the cases construing it,” and, having arrived at that conclusion, did not “reach the other asserted bases for payment.”
 
 Id.
 
 at 402.
 

 It appears from the Court of Appeals’ opinion that on the appeal the defendants advanced three new grounds for affirming the fee award in their favor, not previously asserted before this Court: (1) the “common benefit” exception to the American Rule, on the theory that § 501(b) is a “trust statute;” (2) “promissory-equitable estoppel,”' because the Union promised in writing when the litigation started to' pay the costs of a successful legal defense; and (3) the policy theory that vacating the award would “emasculate union democracy” by permitting a union to reimburse exonerated officers (or not) at the union’s whim.
 
 See
 
 114 F.3d at 374.
 

 II.
 

 With all due respect, for this reader at least the Court of Appeals’ opinion remanding the case contains two Delphic phrases.
 
 [2]
 

 A.
 

 The Court of Appeals said of its opinion that “our discussion is limited to analyzing whether § 501(b) requires reimbursement of vindicated officers’ attorney’s fees,” 114 F.3d at 375, a question the Court answered in the negative. Thus the Court of Appeals did not address the other two bases for reimbursement defendants initially asserted before this Court (and which I did not reach): the “bad faith” exception to the American Rule; and New York law applicable to vindicated corporate officers and directors.
 
 See
 
 886 F.Supp. at 400.
 

 Similarly, the Court of Appeals did not address the three bases for reimbursement that defendants asserted for the first time in that Court: a “common benefit” analysis; a “promissory-equitable estoppel” theory founded on contract; and a “union democracy” analysis.
 
 See
 
 114 F.3d at 374.
 

 After discussing § 501(b) and cases interpreting that section of the LMRDA, the Court of Appeals stated its conclusion at 114 F.3d 379:
 

 We therefore hold that union officials who successfully defend against claims under the LMRDA for breach of fiduciary duty may not — by invoking § 501(b)
 
 or general equitable principles
 
 — compel reimbursement from the union for the costs of their legal defense (including attorney’s fees), (emphasis added)
 

 The Court of Appeals did not define the phrase “general equitable principles.” Thus the first Delphic obscurity relates to the phrase’s limiting effect, if any, upon the alternative grounds for reimbursement that this Court is permitted to consider on remand.
 

 Not surprisingly, during oral argument on remand counsel for the parties disagreed about the phrase’s meaning and effect. Counsel for defendants expressed the view that “general equitable principles” should be read as limited “to concepts of equity arising directly out of and directly implicating § 501(b),” but not intended “to preclude other equitable principles.” Transcript of Oral Argument (hereinafter “Tr.”) at 10. Counsel for the Union argued that the effect of the phrase was to limit defendants’ reimbursement theories “to a specific statute that empowers them or a specific common law right acknowledged by this Court of general application and there are none”; specifically, counsel asserted, the phrase foreclosed reimbursement based upon “common benefit and union democracy.” Tr. 27-28.
 

 B.
 

 The second Delphic uncertainty is found in the Court of Appeals’ language directing remand, following immediately upon the passage just quoted. The Court said:
 

 
 *315
 
 Accordingly, we vacate the district court’s order awarding attorney’s fees to the defendant officers in this case. Because the district court based its fee award solely on § 501(b), without considering other possible grounds, we remand this case to the district court to determine whether the defendant officers may be awarded attorney’s fees
 
 (and have preserved the right to seek such
 
 fees) on other grounds or rationales, including those proffered in the district court
 
 (ie.,
 
 the “bad faith” exception to the “American Rule” and various provisions of New York state law) and those argued here on appeal
 
 (ie.,
 
 “common benefit” analysis, promissory estop-pel, or preservation of union democracy).
 

 114 F.3d at 379 (emphasis added).
 

 By the emphasized phrase, the Court of Appeals appears to contemplate determination by this Court on remand of the question whether defendants “preserved the right to seek such fees”
 
 (ie.,
 
 fees based upon the several alternative grounds)
 
 in this Court.
 
 I specify “in this Court” because it would lie beyond a district court’s competence to decide whether a particular claim or issue has been preserved for resolution at the appellate level.
 

 But the Court of Appeals’ opinion does not accompany this passing reference to preservation of defendants’ rights with any analysis of the factors which result in preservation or abandonment of a particular ground for reimbursement of attorney’s fees. That leaves the parties free to quarrel about the meaning of the phrase, and of course they do.
 

 Counsel for defendants contended that “the preserve language means whether the defendants have abandoned or decided not to rely on any ground that was pressed in the Court of Appeals and any ground pressed here,” Tr. 12, and further that none of the grounds initially raised in the District Court or in the Court of Appeals has been abandoned, so that all the grounds previously asserted in either forum have been preserved for reassertion on remand. Counsel for the Union argued that the “preserved” language limited defendants to the three grounds initially relied upon before the District Court (§ 501(b), New York State law, and the bad faith exception), that the Court of Appeals’ opinion eliminated § 501(b), and counsel for defendants “has now waived” the other two grounds because “[h]e does not advocate in his present motion [on remand] either of those grounds,” Tr. 21, leading to the conclusion that, by reason of one phrase or the other, not one of the alternative grounds or rationales defendants asserted in either forum survives to fight another day on remand. Counsel’s interpretations come down to a choice between everything and nothing: a difference in reasoning characteristic of this bitterly contested litigation.
 

 C.
 

 The proper interpretation of these phrases in the Court of Appeals’ opinion poses threshold issues of exegesis with which I must deal on remand.
 

 1.
 
 “General Equitable Principles”
 

 The phrase “principles of equity” (which I take to have the same meaning as “general equitable principles”) first appears in the Court of Appeals’ opinion at 114 F.3d at 379. The Court was there quoting from this Court’s initial opinion, which regarded
 
 Morrissey v. Segal,
 
 526 F.2d 121 (2d Cir. 1975), as controlling authority on the meaning of § 501(b), and derived from
 
 Morrissey v. Segal
 
 “principles of equity” which obligated the Union at bar to pay the legal expenses of its vindicated officers. That portion of this Court’s opinion is found at 886 F.Supp. at 401-02, where I said: “[TJhe eight defendant officers who had won summary judgment were vindicated just as surely as by a judgment in their favor after trial; the Union was therefore required by principles of equity to pay [the defendant officers’] legal expenses. That I conceive to be the holding
 
 *316
 
 of
 
 Morrissey v. Segal.
 
 ” (internal quotation marks omitted).
 

 The Court of Appeals concluded that this Court misconceived the holding of
 
 Morrissey v. Segal,
 
 which in that Court’s view stated the more limited proposition that § 501(b) permitted, but did not mandate, union reimbursement of vindicated officers. The Court of Appeals reasoned that such permissive power, coupled with other provisions of § 501(b) requiring “a preliminary showing of merit ...., should provide sufficient financial protection of union officials against nuisance suits.” 114 F.3d at 378 (citation and internal quotation marks omitted). The Court of Appeals then said:
 

 The district court therefore erred in deducing from
 
 Morrissey
 
 that reimbursement of attorney’s fees is required by equitable principles.
 
 See Doyle,
 
 886 F.Supp. at 401-02.
 

 Id.
 

 This exegetic analysis makes it clear that the Court of Appeals has precluded defendants’ reliance upon “general equitable principles” as a means of avoiding what the Court held to be the plain language of § 501(b).
 
 See
 
 114 F.3d at 375 (“But we do not think that the plain language of the statute can support the creation of a right of reimbursement against a union that is unwilling to pay; substantially for that reason, we conclude that § 501(b) does not compel such payment or reimbursement.”). Accordingly, by the phrase “general equitable principles,” thus construed, the Court of Appeals’ opinion bars any effort by defendants to derive or deduce from § 501(b) principles of equity entitling them to reimbursement of attorney’s fees from the unwilling Union. Equitable principles which spring from sources entirely unrelated to § 501(b), if such there be, would on this analysis not be barred from consideration.
 

 The effect of this construction of the phrase upon the defendants’ several asserted grounds for reimbursement is considered
 
 infra.
 

 2. “Preserved the Right to Seek”
 

 The question of whether a litigant has preserved or abandoned a claim or issue arises most frequently in appellate practice, where the matter is governed by Fed. R.App.P.28, requiring,
 
 inter alia,
 
 an appellant’s brief to contain all his contentions.
 
 See, e.g., Cruz v. Gomez,
 
 202 F.3d 593 (2d Cir.2000) (“When a litigant — including a pro se litigant — raises an issue before the district court but does not raise it on appeal, the issue is abandoned.”) (202 F.3d at 596 fn. 3);
 
 LoSacco v. City of Middletown,
 
 71 F.3d 88, 91 (2d Cir.1995) (“Although LoSacco stridently opposed the motion, he did not raise this issue in his appellate brief. Consequently, he has abandoned it.”).
 

 In its present procedural posture, the case at bar presents the issue whether defendants have abandoned their right to assert any particular grounds for reimbursement of attorney’s fees
 
 in the District Court
 
 on remand.
 

 The Union’s first contention is that defendants have abandoned the other two grounds asserted in their first fee application in 1994: the “bad faith” exception, and New York statutes pertaining to corporate officers and directors,
 
 [3]
 
 by not raising them again on the present application following remand. There is no substance to this contention. Even if defendants had not mentioned these grounds in their present briefs, they were asserted in their 1994 briefs and this Court did not reach them for decision; simple fairness requires that they be regarded as preserved for
 
 initial
 
 consideration by the District Court. But the fact is that defendants’ present briefs rely on New York law (Main Brief at 31-32 and Reply Brief at 12-14) and reassert the
 
 *317
 
 “bad faith” exception to the American Rule (Main Brief at 45 and Reply Brief at 14-15).
 
 [4]
 

 There remains for consideration whether the three grounds defendants first asserted in the Court of Appeals are “preserved” for decision by the District Court on remand. To reiterate, those grounds are “common benefit,” the Union’s purported written promise to reimburse, and “union democracy.”
 

 The Union states correctly that defendants asserted none of these grounds in this Court in their initial fee application. The question is whether they should for that reason be regarded as precluded or abandoned on remand.
 
 [5]
 

 In the absence of a rule of procedure squarely addressing the question (and none is cited), I think that in these circumstances the District Court has some discretion in deciding whether or not to entertain a claim. It is a discretion akin to that enjoyed by the Court of Appeals, whose power to regard a claim as abandoned has been previously noted. In
 
 In re McLean Industries, Inc.,
 
 30 F.3d 385, 387 (2d Cir.1994),
 
 cert. denied,
 
 513 U.S. 1126, 115 S.Ct. 934, 130 L.Ed.2d 880 (1995), the Second Circuit said:
 

 In this Circuit, we reserve considerable discretion to review purely legal questions not formally raised in the district court. Moreover, we have made plain that arguments made on appeal need not be identical to those made below if they involve only questions of law and additional findings of fact are not required, (citations and internal quotation marks omitted).
 

 Applying those criteria to the case at bar, I regard the “common benefit” and “union democracy” grounds for reimbursement, briefed in the Court of Appeals but not previously asserted in this Court, as sufficiently preserved for my consideration on remand. They present only questions of law, and require no further findings of fact.
 
 [6]
 

 
 *318
 
 I reach a different conclusion with respect to the claim based upon the Union’s purported written agreement to reimburse these defendants for their attorney’s fees. That claim is based upon a copy of a document which defendants presented to the Court of Appeals, addressed to unnamed “officers” by an individual named “Jerry Tauber,” whose position. and authority do not appear, and bearing an incomplete date (“April 17,198”). The document, even assuming that the proffered copy is the same as the original, cries aloud for explication by further fact finding. If defendants wished to rely upon such an agreement in demanding reimbursement of attorney’s fees, they should have included it in their initial application in 1994. Defendants’ contract theory of reimbursement is not timely asserted, does not invoke only a question of law, and would necessitate further factual inquiries. Exercising my discretion in accordance with the criteria enunciated in
 
 McLean Industries,
 
 I conclude that this rationale for reimbursement is not preserved for consideration by this Court on remand.
 

 III.
 

 I turn now to the defendants’ surviving grounds for reimbursement by the Union of their attorney’s fees.
 

 1.
 
 “Common Benefit”
 

 While nothing in the record establishes the defendants’ abandonment of these grounds for reimbursement, ■ which are to that extent “preserved” for consideration by this Court,
 
 see
 
 Part U.C.2.,
 
 supra,
 
 I hold they are precluded by the Court of Appeals’ embargo upon “general equitable principles,” as that phrase is construed in Part II.C.l.
 

 The “common benefit” exception to the American Rule of attorney’s fees is an equitable principle, as the first case on the point defendants cite in their Main Brief at 16 makes plain:
 
 Amalgamated Clothing and Textile Workers Union v. Wal-Mart Stores, Inc.,
 
 54 F.3d 69, 71 (2d Cir.1995) (“This exception is premised on the equitable principle that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant’s expense.”) (citation and internal quotation marks omitted). Moreover, defendants’ Main Brief identifies § 501(b) as the specific source of that equitable principle in the case at bar; the caption to Point 1 at 16 characterizes § 501(b) as “the quintessential ‘common benefit’ statute.” Defendants’ entire argument on this point is that the policy considerations underlying the LMRDA in general and § 501(b) in particular give rise to an “equitable principle” (namely, the common benefit exception) which entitles them, as vindicated union officers, to reimbursement of attorney’s fees by the unwilling Union. It passes understanding how this argument can survive the Court of Appeals’ decision reversing my own. While I expressed the view that the defendants’ right to reimbursement “turns upon principles of equity,” 886 F.Supp. at 401, and derived from § 501(b) and earlier cases construing it equitable principles sufficient to justify reimbursement, it is precisely on that point that the Court of Appeals disagreed, holding that “the plain language of the statute” left “general equitable principles” with no legitimate office to perform. 114 F.3d at 375, 379. It matters not that the “common benefit” exception was not discussed specifically in this Court’s prior opinion; the Court of Appeals’ conclusion that defendants are precluded from “invoking § 501(b) or general equitable prin
 
 *319
 
 ciples” sweeps sufficiently broadly to include common benefit analysis within its prohibition.
 

 Quite apart from the Court of Appeals’ decision in this case, which for the reasons stated precludes defendants’ invocation of general equitable principles such as common benefit, defendants cite no federal case holding that a union officer’s vindication confers upon the union and its members (as opposed to the individual officer) a benefit sufficiently
 
 common
 
 in character to justify reimbursement of the officer’s attorney’s fees by the union. Defendants cite a number of LMRDA cases where courts utilized common benefit analysis to justify reimbursement of attorney’s fees incurred by union members whose successful litigation efforts (by complaint or intervention) against their union or its officers vindicated one or another of the rights guaranteed by the statute. Thus defendants’ briefs refer, among other cases, to
 
 Hall v. Cole,
 
 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973) (implicating Title I of the LMRDA);
 
 Rodonich v. Senyshyn,
 
 52 F.3d 28 (2d Cir.1995) (Title I);
 
 Donovan v. CSEA Local Union 1000,
 
 784 F.2d 98 (2d Cir.1986),
 
 cert. denied,
 
 479 U.S. 817, 107 S.Ct. 74, 93 L.Ed.2d 30 (1986) (Title IV);
 
 Catlett v. Local 7370,
 
 69 F.3d 254 (8th Cir.1995) (Title I);
 
 Usery v. Local Union No. 639,
 
 543 F.2d 369 (D.C.Cir.1976),
 
 cert. denied,
 
 429 U.S. 1123, 97 S.Ct. 1159, 51 L.Ed.2d 573 (1977) (Title V); and
 
 McDonald v. Oliver,
 
 525 F.2d 1217 (5th Cir.1976), ce
 
 rt. denied,
 
 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976) (Title III).
 
 [7]
 

 Such cases as these are entirely off the mark.
 
 Hall v. Cole,
 
 412 U.S. at 5, states that the common benefit exception to the American Rule “involves cases in which the plaintiffs successful litigation confers a substantial benefit on the members of an ascertainable class, and where the court’s jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them.” That proportionate spreading of costs among all union members ben-efitted by the plaintiff union member’s efforts is accomplished by directing that his attorney’s fees be reimbursed by the union treasury (as defendants at bar request); but the entitlement does not arise in the absence of an identifiable benefit bestowed upon an ascertainable class of beneficiaries (in LMRDA cases, typically all union members).
 
 See also Boeing Co. v. Van Gemert,
 
 444 U.S. 472, 478-479, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) (the “common-fund” exception to the American Rule articulated by
 
 Alyeska Pipeline Service Co. v. Wilderness Society,
 
 421 U.S. 240, 265 n. 39, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)), requires that “the classes of persons benefit-ted by the lawsuits were small in number and easily identifiable. Second, the benefits could be traced with some accuracy. Finally, there was reason for confidence that the costs [of litigation] could indeed be shifted with some exactitude to those benefitting” (citation and internal quotation marks omitted).
 
 [8]
 
 The Second Circuit
 
 *320
 
 said in
 
 Rodonich,
 
 52 F.3d at 33, that while the potential benefits conferred by a litigant’s efforts upon the union membership “are intangible and indirect, even atmospheric, they may nevertheless be substantial,” and remanded the case for a trial court inquiry into whether such a common benefit could be demonstrated. The Second Circuit’s opinion in
 
 Rodonich
 
 did not further define “atmospheric,” but it is clear enough that to justify common benefit treatment, the benefits must be grounded in something conferred upon the membership, not just upon individuals.
 

 Defendants at bar contend that their litigation success in vindicating themselves indirectly benefitted the Union and generations of union officers yet unborn. However, in the absence of any federal caselaw supporting that proposition, defendants are reduced to the conclusory argument that their “successful defense conferred a common benefit upon the Union,” citing only to “Journal excerpts
 
 supra.”
 
 Main Brief at 20. That is a reference to quotations from two law journal articles which appear in the Main Brief at 19-20. True enough, the authors of those articles advocate public policies which if adopted would make defendants’ costs reimbursable by the Union under § 501(b). Indeed, in my prior opinion I derived some support for my now-reversed construction of § 501(b) from one of those articles, appearing at 73 Yale Law Journal 443 (1964), which the Second Circuit cited in
 
 Morrissey v. Segal,
 
 526 F.2d at 128-29.
 
 See
 
 886 F.Supp. at 401. That support evaporates in the face of the Court of Appeals’ dismissive observation that Morrissey’s “bare citation” to a “student article — without discussion or explanation — is an insufficient basis on which to conclude that mandatory reimbursement of attorney’s fees is authorized by that opinion.” 114 F.3d at 378 n. 8.
 

 In the absence of any federal authority, defendants cite a state court decision,
 
 Greensburg Local #761 Printing Specialities v. Robbins,
 
 549 N.E.2d 79 (Ind.App. 4th Dist.1990), for the proposition that the common fund exception to the American rule entitles vindicated defendants in union related litigation to reimbursement of their attorney’s fees from the union treasury. While of course I am not bound by this Indiana intermediate appellate case, decided by a divided panel, it does not assist defendants at bar in any event. In
 
 Greensburg
 
 union members, concerned with the fiscal management of the union treasury by the union president, one Blake, filed a complaint against the president with the prosecuting attorney. Charges were filed against the president, investigated, and then dismissed. Blake was defeated for re-election and, after the installation of new officers, “the Union treasury began to increase and continued to do so substantially.” 549 N.E.2d at 79-80. Blake sued the complaining union members for defamation and malicious prosecution. A jury trial resulted in judgment for the members. In these circumstances, the vindicated union members sued the union for litigation costs and attorney’s fees incurred in defending against the president’s claims.
 

 A divided panel of the Indiana appellate court, affirming the trial court, upheld the members’ claims for attorney’s fees. The majority reasoned:
 

 The record here does not indicate why internal Union measures were not used to investigate the [president’s] suspected wrongdoing. The trial court reasonably could have inferred Blake’s presidential standing deterred this measure. Further, the union treasury, the subject of the Union Members’ efforts, increased substantially after Blake’s defeat. While different financial management theories may account for this, an equally viable explanation is the Union Members’ efforts protected and preserved the treasury, benefitting the Union as a whole. The suit against Union Members was a part of the whole transaction which ultimately increased the funds in the Union’s treasury. The trial court did not abuse its discretion in ordering
 
 *321
 
 the Union to pay the Union Members’ litigation expenses and costs, including attorney fees, under the common fund exception.
 

 549 N.E.2d at 81. The dissenting judge said:
 

 I fail to perceive how the Union Members’ defense against a malicious prosecution action, which action gave rise to their claim for attorney fees, served to create or preserve the Union treasury fund. The general rule that each party must pay its own attorney fees is controlling.
 

 Id.
 

 I am free to choose between the majority and dissenting opinions in
 
 Greensburg,
 
 and think that the latter more closely accords with sound common fund analysis. In any event, the majority’s rationale furnishes no support for the defendants at bar, since it depends upon a showing that the vindicated members’ efforts preserved or increased a common fund, namely, the union treasury. That is a showing that the defendants at bar cannot make.
 

 It follows from this analysis of the cases that, even accepting the defendants’ narrow construction of the Court of Appeals’ phrase “general equitable principles,” their common fund rationale is so deeply rooted in § 501(b) and the policy considerations defendants discern there that the Court of Appeals’ rejection of “general equitable principles,” although those principles are not specifically defined, precludes defendants from relying upon the common fund principle as a vehicle for reimbursement of their attorney’s fees.
 

 In the alternative, the common fund principle does not apply to this case on the facts, since in practical reality it is the defendants, and not the Union members, who reap the readily traceable benefits of counsel’s successful efforts.
 

 2.
 
 “Union Democracy”
 

 It is not entirely clear from defendants’ briefs whether they regard the “union democracy” ground for reimbursement of their attorney’s fees as an equitable claim or a claim based upon a proper construction of the LMRDA. On either theory, this is not a viable ground.
 

 Given the high degree of animosity with which the plaintiffs (at the pertinent times successful insurgent Union officers) and defendants (former Union officers defeated for re-election) regard each other, one may understand in human terms defendants’ outrage that they should be dependent upon plaintiffs to reimburse them from the union treasury (or, as plaintiffs have done, to refuse to do so). It is the practical equivalent of requiring Mark Antony to apply to Brutus for his speaker’s fee after eulogizing the slain Caesar.
 

 Nevertheless, to the extent that defendants rely upon principles of equity to remedy this perceived unfairness, their claim is so bound up with arguments defendants derive from the LMRDA in general and § 501(b) in particular that 1 conclude the claim is also precluded by the Court of Appeals’ rejection of “general equitable principles” as a ground for reimbursement. I dealt with that subject at greater length in considering the “common benefit” ground, and that reasoning applies with equal force here.
 

 I also conclude that the Court of Appeals’ specific construction of § 501(b) precludes any “union democracy” claim based upon the wording or perceived intent of the statute. The Court of Appeals has made plain its view that “neither § 501 nor any general equitable principle compels a union to grant reimbursement,” 114 F.3d at 376, principally for the reason that “we do not think that the plain language of the statute can support the creation of a right of reimbursement against a union that is unwilling to pay,”
 
 id.
 
 at 375. That conclusion, the Court of Appeals stated in the ensuing discussion, is based upon the principle that
 

 [t]he plain meaning of legislation should be conclusive, except in the rare cases in
 
 *322
 
 which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters. The statutory language remains of paramount importance because when we find the terms of a statute unambiguous, judicial inquiry is complete, except in rare and exceptional circumstances.
 

 Id.
 
 at 375-76 (citations and internal quotation marks omitted).
 

 That rationale forecloses defendants’ argument that a right of reimbursement “against a union that is unwilling to pay” may be derived or deduced from § 501(b) or other, more general policy considerations underlying the LMRDA. As the result of the Court of Appeals’ opinion in this case, the rule in this Circuit now is that “the policy of permitting a union to reimburse its officers who have successfully defended themselves against charges of violating § 501 provides adequate protection of union officers from baseless litigation.” 114 F.3d at 377 (citations and internal quotation marks omitted).
 

 To be sure, the Court of Appeals’ statutory construction confers upon the union the power to decide whether or not to reimburse the defendant officers, even at the union’s “whim,” to use defendants’ pejorative noun. That power of decision outrages defendants; however, given the Court of Appeals’ decision, this Court cannot discern in the governing statute or any “general equitable principle” any authority to intervene in the process by which, for whatever reasons, this Union declines to reimburse the attorney’s fees incurred by these officers.
 
 [9]
 

 IV.
 

 I come now to the two rationales for reimbursement initially urged by the defendants before this Court, which neither this Court nor the Court of Appeals have considered on their merits: the “bad faith” exception to the American Rule; and provisions of New York State law regarding the reimbursement of corporate officers and directors vindicated in litigation against them.
 

 1.
 
 The “Bad Faith” Exception
 

 The Supreme Court’s frequently cited decision in
 
 Alyeska Pipeline Service Co. v. Wilderness Society,
 
 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), states that “[i]n the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys’ fee from the loser.” This is, in the vernacular, the “American Rule,” to which
 
 Alyeska
 
 recognizes certain exceptions as “assertions of inherent power in the courts to allow attorneys’ fees in particular situations,”
 
 id.
 
 at 259, 95 S.Ct. 1612. One of these exceptions, upon which defendants at bar rely, allows attorney’s fees to the winning litigant “when the los
 
 *323
 
 ing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.”
 
 Id.
 
 (citations and internal quotation marks omitted). In
 
 Hall v. Cole,
 
 412 U.S. 1, 5, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973), the Court said with respect to the bad faith exception:
 

 In this class of cases, the underlying rationale of “fee shifting” is, of course, punitive, and the essential element in triggering the award of fees is therefore the existence of “bad faith” on the part of the unsuccessful litigant.
 

 Given the sometimes kaleidoscopic complexities of litigation, whether or not the losing party has conducted itself in bad faith is intensely fact-specific. But considerable guidance may be gleaned from appellate cases. A court may award fees against the responsible party under the bad faith exception if it finds “that a fraud has been practiced upon it, or that the very temple of justice has been defiled, ... as it may when a party shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order.”
 
 Chambers v. NASCO, Inc.,
 
 501 U.S. 32, 46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (citations and internal quotation marks omitted). “ ‘Bad faith’ may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation.”
 
 Hirschfeld v. Board of Elections,
 
 984 F.2d 35, 39 (2d Cir.1993). Bad faith may not be lightly found, and the party charging it bears a considerable burden of persuasion. “Because of their very potency, inherent powers must be exercised with restraint and discretion.” 501 U.S. at 44, 111 S.Ct. 2123. The Second Circuit, “in recognizing the need for restraint, has always required a particularized showing of bad faith to justify the use of the court’s inherent power.”
 
 United States v. International Brotherhood of Teamsters,
 
 948 F.2d 1338, 1345 (2d Cir.1991). Thus the Second Circuit has “declined to uphold awards under the bad-faith exception absent both clear evidence that the challenged actions are entirely without color, and are taken for reasons of harassment or delay or for other improper purposes and a high degree of specificity in the factual findings of the lower courts.”
 
 Id.
 
 (citations and internal quotation marks omitted). To award attorney’s fees under the bad faith exception, “the trial court must find clear evidence that (1) the offending party’s claims were entirely meritless and (2) the party acted for improper purposes.”
 
 Agee v. Paramount Communications, Inc.,
 
 114 F.3d 395, 398 (2d Cir.1997). “The test is conjunctive and neither meritlessness alone nor improper purpose alone will suffice.”
 
 Sierra Club v. U.S. Army Corps of Engineers,
 
 776 F.2d 383, 390 (2d Cir.1985),
 
 cert. denied,
 
 475 U.S. 1084, 106 S.Ct. 1464, 89 L.Ed.2d 720 (1986);
 
 see also Sussman v. Bank of Israel,
 
 56 F.3d 450, 460 (2d Cir.1995),
 
 cert. denied,
 
 516 U.S. 916, 116 S.Ct. 305, 133 L.Ed.2d 210 (1995) (same). The Second Circuit recently stated and applied these principles in
 
 Eisemann v. Greene,
 
 204 F.3d 393 (2d Cir.2000), where it quoted
 
 Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.,
 
 782 F.2d 329, 344 (2d Cir.1986):
 

 To ensure ... that fear of attorneys’ fees against them will not deter persons with colorable claims from pursuing those claims, we have declined to uphold awards under the bad-faith exception absent both clear evidence that the challenged actions are entirely without color, and are taken for reasons of harassment or delay or for other improper purposes
 
 and a high degree of specificity in the factual findings of the lower couris.
 

 (emphasis added by court in slip opinion at 8275).
 
 [10]
 

 
 *324
 
 In support of their claim for attorney’s fees under the bad faith exception, defendants argue principally that plaintiffs action, filed on April 4, 1986, was motivated solely by the improper purpose of influencing an election of union officers scheduled to take place in June 1986. Thus defendants contend in their Main Brief after remand at 2:
 

 Election-eve canards of this genre are strike-suits of propaganda value only, and have become insurgents’ weapon of choice to garner base political mileage during contested union elections. This scandalously publicized suit charged defendants with misconduct in a 1984 Union election and embezzlement of Union assets. Creating a wave of scandal generated by their election-eve stunt, insurgents won the 1986 officer elections by' a narrow margin and in June 1986 were installed in Union office.
 

 The factual premise underlying this argument is that prior to the institution of plaintiffs’ suit, the Union under the leadership of President Doris Turner and the slate of officers she headed had performed with total honor and integrity, their reputations unblemished even by so much as a rumor of impropriety, only to be brought down by an election-eve, malicious “strike-suit,” a “stunt” of “propaganda value only,” intended to “garner base political mileage,” whose allegations were made up out of whole cloth. Plaintiffs suit, thus characterized, was factually false and known by plaintiffs to be so at the time of filing, and so were the two subsequent amended complaints.
 

 If the record supported that premise, one may readily agree that plaintiffs commenced their action in bad faith, as that term is defined by the cases. But the truth, as so often occurs, is considerably more complicated.
 

 The record shows that the moving defendants, together with Doris Turner and Telbert King, formed a slate of candidates for Union office headed by Turner which won re-election during a regularly scheduled election of officers in April 1984. Plaintiffs’ brief opposing defendants’ initial application for attorney’s fees says at 8 without subsequent contradiction:
 

 Defendants had held Union office together, had run for office together on a common slate, were running for re-election jointly on the same slate, and functioned and were known to function together within the Union as a political unit.
 

 Complaints were filed with the United States Department of Labor, charging that the 1984 election was tainted by violence and corruption on the part of the Turner faction. The record reflects the following facts (which may be gleaned from the indicated contemporaneous documents):
 

 1. On November 16, 1984, David White, the Union’s former executive vice president, in the presence of Steven George Biller, an investigator of the Department of Labor, executed an affidavit stating that during the tallying of the written ballots for the 1984 election, the defendants under Turner’s direction destroyed ballots cast in favor of the insurgent slate and forged ballots in favor of the incumbents, namely, the Turner faction.
 

 2. At some time between May 9 and July 29, 1985, Richard G. Hunsucker, the director of the Department of Labor’s Office of Elections, Trusteeships and International Union Audits, sent a letter to the president of the national union to which Local 1199 belonged, stating that his Office had conducted “an investigation into the election of officers of District 1199,” and advising of a number of “investigative findings.”
 
 [11]
 
 The Department found,
 
 inter
 
 
 *325
 

 alia,
 
 that “some validly cast ballots were altered or had other ballots substituted for them”; “votes cast on a number of voting machines were erased prior to being counted”; members “at some polling sites were denied the right to vote a secret ballot”; and that “the union failed to maintain all records pertaining to the election.” The Hunsucker letter concluded that “ft]hese findings are not to be construed as a final determination by the Secretary that actionable violations have or have not occurred in the election.”
 

 3. An Administrative Law Judge of the National Labor Relations Board, having heard evidence on a series of complaints made against the Union during 1984 and 1985, issued an opinion concluding that the Union had violated the statute by threatening or assaulting employees with physical harm for engaging in a protected activity; threatening employees who disagreed with the Union’s “officers or agents” that the Union would not represent them in employer disciplinary proceedings; and causing employees to fear Union retribution by photographing them while engaged in protected intraunion activities.
 

 [In the light of circumstances such as these, as Judge Sweet had occasion to note in the separate unrelated case of
 
 Johnson v. Kay,
 
 742 F.Supp. 822, 824 (S.D.N.Y.1990), the 1986 Union election was “supervised by the Department of Labor.”]
 
 [12]
 

 4. In another separate case,
 
 Johnson v. Local 1199,
 
 1986 WL 166 (S.D.N.Y., January 31, 1986), Georgianna Johnson, who headed the insurgent slate of Union officers opposing the incumbent Turner slate in the 1986 election, and other Union members sued in this Court under section 201 of the LMRDA, 29 U.S.C. § 431, for injunctive relief permitting them to examine the Union’s underlying books, records and accounts.
 
 [13]
 
 The plaintiffs had previously been limited to an examination of the Union’s general ledgers. I granted plaintiffs access to all the Union’s financial documents, including the check registers, because I concluded that “the economic increases, alterations, shifts, and other notations contained in the defendant union’s financial statements,” as alleged in the complaint, established “just cause” pursuant to § 431(c) for a more searching examination. 1986 WL 166 at *1. I reasoned that “[rjecitations in such statements are sufficient to establish statutory just cause if a reasonable union member would be put to further inquiry,” and “[t]hat showing has been made here.”
 
 Id.
 
 (citation and internal quotation marks omitted). I issued a preliminary injunction directing the Union and its then incumbent officers to,
 
 inter alia,
 
 “make available forthwith to plaintiffs and/or their legal and/or accounting advisors for inspection and copying all financial books, records, and accounts of defendant Local 1199 for the fiscal years October 1, 1980 through September 30, 1984, including without limitation all check registers of Local 1199” and two subordinate entities. 1986 WL 166 at *4. I observed that “[a]s for the requisite element of irreparable harm, it follows necessarily from the facts that the union elections will take place in March 1986, and that campaign literature, if it is to be effective at all, must be mailed to the membership in February.”
 
 Id.
 

 [14]
 

 That conclusion reflects the common-sense proposition that if examination of the Union’s financial records demonstrated wrongdoing by the incumbent officers, such information would furnish legitimate ammuni
 
 *326
 
 tion for the insurgent slate to shoot prior to the election.
 

 5. In July 1985 the Johnson group of insurgents referred to in H4 retained the accounting firm of Wilen and Klapper to inspect the Union’s financial records. The limited access granted by the Union prompted the action described in H 4 which culminated in this Court’s January 31, 1986 injunction. Thereafter Wilen and Klapper resumed its examination. The accountants submitted reports dated February 17 and March 21, 1986, to the law firm of Gladstone, Reif & Meginniss, counsel for the Johnson group.
 
 [15]
 
 These reports reveal considerable grounds for concern about the integrity of the Union’s financial records and, by inevitable extension, the integrity of its officers’ financial dealings. For example, very considerable amounts of Union funds were disbursed by checks made out only to “cash,” with no backup documentation to show the recipients or the purposes of the disbursements. The accountants state at pages 7-8 of their March 21,1986 report:
 

 Local 1199’s failure to institute and follow proper control procedures is perhaps best demonstrated by the large number of checks that are made out to “cash.” In fiscal years 1983 and- 1984, we have calculated that Local 1199 disbursed a total of $204,739 in such checks and that a total of approximately $72,-000 was cashed by various Union employees under the control of President Doris Turner. For a large portion of these expenditures, we have no way of knowing who ultimately received these monies or whether the monies were spent on proper Union-related business .... We have calculated that President Turner controlled directly or indirectly approximately $72,000 and that she received $9,768 in checks made out directly to her. These sums do not include her expense account or salary.
 

 The accountants’ reports detail many other specific and troublesome findings, such as apparent alterations of vouchers and other documents by Union staff between the time the accountants examined the documents at the Union’s offices and their receipt at the accountants’ offices.
 

 All these cautionary red flags were affixed to public masts and snapping briskly in the winds of intraunion rivalry
 
 prior
 
 to the filing of the plaintiffs’ complaint, on April 4, 1986. Plaintiffs’ counsel accurately summarize the claims plaintiffs asserted against Turner and her co-Union officers in the original complaint and the two amended pleadings:
 

 Plaintiffs presented three categories of claims in this case, which was begun in 1986:(a) the defendants, while incumbent officers of 1199, engaged in acts of wrongdoing in connection with Union elections, depriving the membership of fair and meaningful votes, in order to retain personal power and position within the Union; (b) defendants engaged in and caused their supporters to engage in acts of physical violence and intimidation directed toward other 1199 members who opposed defendants’ candidacies and policies, in order to deter such dissent within the Union; and (c) defendants expended or caused the expenditure on Union monies for personal items related to legitimate Union activities.
 

 Plaintiffs’ Brief Opposing Defendants’ Initial Motion for Attorney’s Fees at 8.
 

 These three categories of claims track precisely the contents of the previously available documents described in UH1-5
 
 supra.
 
 In that circumstance, the defendants cannot demonstrate by clear evidence that plaintiffs’ claims were entirely meritless,
 
 and
 
 that in asserting those claims, plaintiffs acted with an improper purpose. Under the Second Circuit cases cited
 
 supra,
 
 defendants would have to demonstrate both prongs to establish the
 
 *327
 
 bad faith exception; in fact, they cannot show either one of them.
 

 As to the first prong, whether plaintiffs’ claims were entirely meritless, the contemporaneous documents generated by reliable third parties (a Department of Labor investigator, an NLRB administrative law judge, and an independent firm of accountants) gave sufficient indications of wrongdoing by the defendants to justify the plaintiffs’ assertion of their claims in litigation. That is so, notwithstanding the fact that at the end of the case plaintiffs did not obtain judgment in their favor on any of the claims. I reach that conclusion on the basis of the Second Circuit’s oft-cited analysis in
 
 Nemeroff v. Abelson,
 
 620 F.2d 339, 348-49 (2d Cir.1980):
 

 A claim is colorable, for the purpose of the bad faith exception, when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim. The question is whether a reasonable attorney could have concluded that facts supporting the claim
 
 might be established,
 
 not whether such facts actually
 
 had been established....
 
 Even if some or all of these facts were not in fact true or might later fail to be established, that is irrelevant to the determination of bad faith under our law. These reasonable beliefs were factually and legally sufficient. To require more would promote the unwarranted abortion of many potentially meritorious claims, (emphasis in original)
 

 In the case at bar, the information available to plaintiffs in April 1968 was more than sufficient to permit their counsel to conclude that defendants’ wrongful conduct of the Union’s affairs “might be established.” Subsequent discovery did not produce sufficient evidence to allow plaintiffs to avoid summary judgment dismissing some of their claims,
 
 see
 
 1993 WL 183788 at *9-’*14, and at a later stage in the litigation plaintiffs “offer[ed] to withdraw most of the claims against the moving defendants,”
 
 Doyle v. Turner,
 
 1994 WL 323889 at *1 (S.D.N.Y.1994). That latter concession is more consistent with good faith than with bad, since it evidenced plaintiffs’ willingness to abandon claims that discovery showed could not be established. In any event, defendants do not demonstrate that plaintiffs’ claims were “entirely meritless” or were not “color-able,” as those words are construed in the context of the bad faith exception.
 

 Nor can defendants establish the second necessary prong, that plaintiffs commenced this action for an “improper purpose.” That is so, even conceding the proposition (undeniable as a matter of common sense) that the plaintiffs hoped, even expected, that the litigation might be disadvantageous to the incumbent Union officers in the upcoming election. The available information with respect to the possible wrongdoing of the Turner slate of officers, which for the reasons stated was sufficient to justify plaintiffs’ assertion of the claims in their complaint, was also pertinent to the Union members’ voting decisions. Indeed, it was precisely for that reason that in the
 
 Johnson
 
 case I granted the insurgents a preliminary injunction fashioned to expedite their access to Union financial records that the incumbents had refused to disclose. In
 
 Johnson,
 
 rejecting the defendants’ demand for a confidentiality condition that “would deprive plaintiffs of any practical use of information contained in the documents,” I said:
 

 Plaintiffs make no bones of their intent to publish to the membership, in the form of campaign literature, any revelations which they perceive to be adverse to the present officers.... But it would be violative of the statute’s remedial purposes to hold that plaintiffs may examine and copy the union’s financial records, but then be inhibited in the use they may make of them.... [ETJxtend-ing the right to copy to union members is necessary to further the purpose of the Act to make full information concerning a union’s financial affairs avail
 
 *328
 
 able to its members. That salutary purpose is more significant, not less so, at a time of union elections.
 

 1986 WL 166 at *3 (citation and internal quotation marks omitted).
 

 So long as the claims plaintiffs asserted were colorable under bad faith analysis (as these were), the further publication to the membership inherent in filing a complaint does not constitute bad faith. From the defendants’ perspective, plaintiffs’ purpose was undoubtedly unwelcome, but it was not improper in law.
 

 Defendants also contend on this post-remand motion that plaintiffs’ bad faith may be inferred because their complaint was subject to dismissal on account of plaintiffs’ failure to comply with the requirements of the LMRDA, 29 U.S.C. § 501(b);
 
 [16]
 
 on account of section 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106,
 
 [17]
 
 which defendants say barred the action; and because the pleadings did not sufficiently allege a RICO claim.
 
 [18]
 

 There is no substance to these contentions, at least when offered to support defendants’ claim for attorney’s fees under the bad faith exception. For that purpose they come too late in the litigation. Assuming without deciding that the complaint was subject to dismissal on any or all of these grounds, defendants chose instead to use plaintiffs’ pleading as a procedural vehicle for counterclaims, on which they ultimately succeeded.
 

 With respect to § 501(b), it appears to be common ground that plaintiffs did not take either of the preliminary steps called for by the statute — requesting the Union to take action and obtaining leave of the Court — before filing their complaint alleging defendants’ violations of the fiduciary duties described in § 501(a). If this Court lacked subject matter jurisdiction as the result of those omissions, the defendants might have a stronger argument that plaintiffs filed the complaint in bad faith. And indeed, defendants suggest in their brief that this is the case; they cite
 
 Coleman v. Brotherhood of Railway and Steamship Clerks,
 
 340 F.2d 206, 208 (2d Cir.1965), as support for the proposition that the request to sue is “mandatory
 
 and jurisdictional.
 
 ” Defendants’ main brief after remand at 2 (emphasis added).
 

 However, defendants’ suggestion that a plaintiffs failure to take the preliminary steps specified by § 501(b) is jurisdictional in nature represents a gloss by defendants upon the Second Circuit decisions construing this aspect of § 501(b).
 
 See Dunlop-McCullen v. Local 1-S, AFL-CIO-CLC,
 
 149 F.3d 85 (2d Cir.1998);
 
 Dinko v. Wall,
 
 531 F.2d 68 (2d Cir.1976);
 
 Cassidy v. Hor-an,
 
 405 F.2d 230 (2d Cir.1968); and
 
 Coleman,
 
 340 F.2d 206.
 

 
 *329
 
 The Second Circuit cases clearly construe the § 501(b) prerequisites to suit as mandatory in nature. A union member’s request that the officers take action “is mandatory and ... its requirements cannot be met by anything short of an actual request.”
 
 Coleman,
 
 340 F.2d at 208.
 
 Cas-sidy
 
 reiterated that holding, adding that “[a]n allegation of the futility of such a request will not suffice.” 405 F.2d at 232. When dissident union members sue a union and its officers under § 501(b) without complying with that section’s prerequisites, the defendants had the option of moving to dismiss the action on that ground. The district court in
 
 Dinko
 
 dismissed an action on those grounds, the Second Circuit noting on appeal that
 

 The basis of the district court’s decision was that plaintiff had not met two requirements of section 501(b): Plaintiff had failed to request that the Union “take court action” before bringing his suit, and he had not made “an adequate showing of ‘good cause’.”
 

 531 F.2d at 71. The Second Circuit reversed, holding that the plaintiffs demand for an “accounting” satisfied the request requirement of § 501(b), and remanded so that the district court could further explain its conclusion that plaintiff had not demonstrated “good cause” for the action. In that regard, the Court of Appeals observed
 

 [t]he factual showing to institute a suit should be no more demanding than that required to defend it against a motion for summary judgment; indeed, it should be somewhat less, since at the earlier stage a plaintiff has not yet had a chance for discovery and a defendant will still have the later protection of a summary judgment motion.
 

 Id.
 
 at 75.
 

 The judicially certified “good cause” required for leave to sue under § 501(b) serves two policies: (1) supervision of union officials in the exercise of their fiduciary obligations and (2) protection, through a preliminary screening mechanism, of the internal operation of unions against unjustified interference or harassment.
 
 Dun-lop-McCullen,
 
 149 F.3d at 85 (citation and internal quotation marks omitted). The Second Circuit has construed “good cause” in section 501(b) “to mean that plaintiff must show a reasonable likelihood of success and, with regard to any material facts he alleges, must have a reasonable ground for belief in their existence.”
 
 Id.
 

 When, as § 501(b) authorizes, a plaintiff acquires a determination of good cause from the district court
 
 ex parte,
 
 the preferred practice for the district court is to then allow the defendants “to move, in effect, to vacate that order,” such practice serving “as a practical means of protecting union officials against vexatious and harassing suits, the obvious policy behind this portion of section 501(b).”
 
 Dinko,
 
 531 F.2d at 73-74.
 

 While a § 501(b) plaintiffs compliance with the statute’s prerequisites is mandatory in the Second Circuit, the Court of Appeals has never said that such compliance is jurisdictional. The distinction is not meaningless, since if the district court’s subject matter jurisdiction depended upon compliance with the prerequisites, the action could be dismissed by the district court or any appellate court
 
 sua sponte,
 
 at any time in the litigation, even after judgment. But I construe the cited cases to mean that a plaintiffs noncompliance with the prerequisites places the defendant union and its officers in a position where they can move to dismiss the complaint, if so advised. A plaintiffs compliance with the prerequisites after such a dismissal would probably not be difficult. Surely no particular difficulty would have arisen in the case at bar, where the incumbent Union officers would not have been likely to respond affirmatively to the insurgent’s request that the officers sue themselves; and the considerable documentary evidence of Union wrongdoing existing at the time, discussed
 
 supra,
 
 would in all likelihood have established “good cause” for the action in the district court’s view,
 
 *330
 
 given the undemanding nature of that preliminary showing.
 

 In point of fact, however, the defendants at bar did not urge noncompliance with the section 501(b) prerequisites and the case proceeded on its merits. I conclude that, in the totality of circumstances, defendants cannot now urge that noncompliance as a badge of plaintiffs’ bad faith when they filed their action.
 

 The reference in defendants’ brief to the Norris-LaGuardia act relates only to the merits of plaintiffs’ claims against one or another of the particular defendants. Defendants’ arguments in that regard, not previously asserted, are not sufficient to demonstrate that plaintiffs acted in bad faith in commencing the action.
 

 Lastly, defendants contend that plaintiffs’ allegations under the RICO statute are indicative of bad faith. I do not agree. The RICO statute includes in its definition of “racketeering activity” a violation of 29 U.S.C. § 501(c) (relating to embezzlement from union funds).
 
 See
 
 18 U.S.C. § 1961(1)(C). While the plaintiffs’ complaints in their various forms alleged breaches by the individual defendants of their fiduciary duties, claims which lie under § 501(b), they also alleged that certain of the defendants’ acts constituted “embezzlement and crimes under § 501(c) of the [RICO] Act.”
 
 See, e.g.,
 
 First Amended Complaint at ¶ 20. I think that the reports of the accountants, facilitated by this Court’s disclosure order in the
 
 Johnson
 
 case, formed a sufficient basis for the assertion of the RICO claim, and decline to characterize that assertion as having been made in bad faith.
 

 For the foregoing reasons, the defendants cannot sustain a claim for attorney’s fees based upon the bad faith exception to the American Rule.
 

 2.
 
 New York State Law
 

 Lastly, defendants claim that New York statutory and case law furnish bases for compelling the Union to pay their attorney’s fees.
 

 Throughout the briefing of defendants’ initial, and renewed motions for attorney’s fees, their state law theories have undergone a process of evolution. Their main brief on the initial motion, dated July 28, 1994, devoted at page 4 only eight lines of text to the entire subject, and cited two cases,
 
 Sequa Corp. v. Gelmin,
 
 851 F.Supp. 106, 109 (S.D.N.Y.1994),
 
 [19]
 
 and
 
 Buffalo Forge Co. v. Ogden Corp.,
 
 595 F.Supp. 593 (W.D.N.Y.1984), for the proposition that “a corporation’s officer against whom the corporation asserted RICO and fraud claims was entitled to be indemnified his reasonable attorney’s fees.” Both cases derived that general principle from §§ 722
 
 et seq.
 
 of the New York Business Corporation Law (“BCL”), although indemnification was denied on the facts in
 
 Sequa.
 

 Defendants’ reply brief on their initial motion, dated October 12, 1994, argued at 9 that “[i]n New York State, a labor union is also covered by New York Not-for-Profit Law” (emphasis added), citing
 
 Sim-oni v. Civil Service Employees Ass’n, Inc.,
 
 133 Misc.2d 1, 507 N.Y.S.2d 371 (Sup.Ct. Albany Cty.1986), and
 
 Woodley v. Butler,
 
 101 Misc.2d 670, 421 N.Y.S.2d 797 (Sup.Ct. N.Y.Cty.1979). The adverb “also” is apparently intended to reprise the references to the BCL found in the cases defendants cited in their main brief.
 
 Simoni
 
 and
 
 Woodley,
 
 cited in the reply brief, have nothing to do with reimbursement of officers’ attorney’s fees, and apply provisions of the New York Not-for Profit Corporation Law (“N-PCL”) to quite different controversies arising out of the affairs of labor unions.
 

 Simoni
 
 held that while “[m]any unions operate as unincorporated associations,”
 
 *331
 
 under which non-statutory rules of governance “could prevail,” the law is settled “that once a union decides to incorporate it is subject to New York State’s statutes controlling corporate activity irrespective of any countervailing union policy,” and identified provisions of the N-PCL applicable to the governance and conduct of affairs of the labor union involved in the case. 507 N.Y.S.2d at 376-77. The precise holding in
 
 Simoni
 
 voided actions taken at a special meeting of union delegates held in violation of N--CPL notice provisions.
 

 Woodley
 
 considered a union member’s standing to sue in state court for breach of three defendant union officers’ fiduciary duties. The officers argued that members lacked standing without having first requested the union to take remedial action, which plaintiffs had not done. The officers sought to draw supportive analogies “to the stockholder’s derivative action (BCL § 626(c)) and Not-for-Profit Corporation’s members’ derivative actions (N-PCL § 623(c)),” 421 N.Y.S.2d at 800. The court, upholding the members’ standing to sue, relied upon a specific provision to that effect in the New York Labor and Management Improper Practices Act (“LL”), the state counterpart to the federal LMRDA,
 
 [20]
 
 rejected any analogies drawn from the BCL, the N-PCL, or the New York General Associations Law (“GAL”), and noted: “The statute of general application must yield to the statute applicable to the specific situation.”
 
 Id.
 
 at 801.
 

 Defendants’ reply brief also stated at 10 that in his opinion in
 
 United States v. Local 1801-1, International Longshoremen’s Association, AFL-CIO,
 
 732 F.Supp. 434, 437 fn. 1 (S.D.N.Y.1990), Judge Sand “recognized but found it unnecessary to reach” union officers’ indemnification rights under §§ 724-726 of the BCL, provisions which are mirrored in §§ 722-725 of the N-PCL.
 

 That paraphrase is something of a stretch.
 
 Local 1801-1
 
 arose out of the government’s RICO action charging a number of local waterfront unions and their officers with corruption. The locals moved for an order allowing them to pay their officers’ attorney’s fees during the litigation. Judge Sand denied that application, citing cases decided under LMRDA § 501(b) which hold that in advance of a determination on the merits of the government’s allegations, the locals and the national union “should be prohibited from providing any financial support to the Officer Defendants for their individual defense.” 732 F.Supp. at 437.
 
 [21]
 
 Judge Sand’s oblique reference to the New York BCL came about during his ensuing discussion in text at 732 F.Supp. at 437:
 

 These motions are brought pursuant to the equitable powers of this Court.
 
 Absent
 
 any provision in the union bylaws permitting advance payment of litigation expenses or any similar statutory authorization, we find no reason not to apply the rule developed in section 501(b) cases.
 

 (emphasis added).
 

 
 *332
 
 After the phrase “any similar statutory authorization” in text, Judge Sand dropped footnote 1, which reads:
 

 Many states provide by statute for advance payment of indemnification expenses in suits against officers and directors of corporations for breach of fiduciary duties. New York Business Corporation Law permits advance payment voluntarily by a corporation or by order of the court and requires repayment if the defending parties are ultimately not found entitled to indemnification. N.Y. Bus.Corp.L., §§ 724(c), 725(c), 726(a) (McKinney’s 1986).
 

 I interpret Judge Sand’s analysis as a conclusion on his part that the BCL did
 
 not
 
 apply to the unions before him, and consequently did
 
 not
 
 provide a “statutory authorization” to the union to advance defense expenses to its officers.
 
 [22]
 
 It is difficult to see how this reference to the BCL assists defendants at bar.
 

 On remand from the Court of Appeals’ opinion rejecting their reimbursement claim under LMRDA § 501(b), defendants for the most part abandon state law claims based upon the New York statutes governing corporations. The defendants’ emphasis is now upon an exonerated fiduciary’s right to reimbursement for the costs of his successful defense, a right defendants contend may be derived from “federal common law,” Main Brief on Remand at 29, and from New York caselaw,
 
 id.
 
 at 31.
 

 Defendants’ retreat from the New York statutes dealing with corporations is understandable, given the fact that the Union is an unincorporated association. That status is alleged in the pleadings at bar,
 
 see, e.g.,
 
 First Amended Complaint at H 3 (“plaintiff Local 1199 is an unincorporated labor union affiliated with the Retail, Wholesale and Department Store Union AFL-CIO”), and has been recognized by Courts in unrelated litigation,
 
 see Mercy Health Services v. 1199 Health and Human Service Employees Union,
 
 888 F.Supp. 828, 829 (W.D.Mich.1995) (“Defendant, Local 1199 of New York, is an unincorporated trade union in New York, New York, which represents approximately 100,000 members in the State of New York.”);
 
 Modeste v. Local 1199 Drug, Hospital and Health Care Employees Union, RWDSU, AFL-CIO,
 
 850 F.Supp. 1156, 1159 (S.D.N.Y.1994) (treating Local 1199 as an unincorporated association for purposes of applicability of the New York GAL). The GAL, which does apply to the Union,
 
 see
 
 18A Mckinney (1994), is a sketchy statute which says nothing on these subjects.
 

 Accordingly the BCL and the N-PCL do not apply to the Union, and I need give no further consideration to the provisions in those statues for the reimbursement, discretionary or compulsory, of the legal expenses of vindicated corporate officers.
 

 Thus defendants’ New York law claims (to which an element of “federal state law” has been added) come down to an assertion that they should be reimbursed as vindicated fiduciaries under principles declared by the law of trusts.
 

 Defendants arrive at that conclusion by means of a two-step analysis. First they argue that section 501(a) of the LMRDA, 29 U.S.C. § 501(a), characterizes (defendants use the verb “anoints”) union officers as “fiduciaries” with respect to the Union and its members. Second, defendants equate a union officer’s
 
 fiduciary
 
 status under § 501(a) with that of a
 
 trustee
 
 as that word is used in the law of trusts.
 

 Defendants’ first assertion is clearly correct. LMRDA § 501 is captioned “Fiduciary responsibility of officers of labor organizations.” Subsection 501(a) is captioned “Duties of officers,” and subsection 501(b), pursuant to which the instant ac
 
 *333
 
 tion was brought, is captioned “Violation of duties.” As the caption to this section reflects, § 501(a), the pertinent portions of which appear in the margin,
 
 [23]
 
 specifies that “[t]he officers, agents, shop stewards and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group,” and accordingly stand in a fiduciary relationship to the union and the members. One would have thought that union officers would bear a fiduciary duty to the union and its members by virtue of common law principles, but Congress, dealing in the LMRDA with the particular universe of labor unions, undoubtedly wished to stress the fiduciary nature of a union officer’s status, as a useful preface to the right conferred by § 501(b) to union members to bring actions against officers in breach of their fiduciary duties.
 

 However, when one comes to the second step in defendants’ analysis, that of equating a “fiduciary” with a “trustee,” the argument becomes problematical.
 

 The problem may be summarized by observing that while every trustee is a fiduciary, not every fiduciary is a trustee. The nouns have related but quite different meanings in the law. Those differences appear from the definitions in
 
 Black’s Law Dictionary,
 
 (7th ed.1999).
 
 Black
 
 defines the noun “fiduciary” at 640:
 

 1. One who owes to another the duties of good faith, trust, confidence, and candor <the corporate officer is a fiduciary to the shareholders >. 2. One who must exercise a high standard of care in managing another’s money or property <the beneficiary sued the fiduciary for investing in speculative securities >.
 

 Black
 
 follows this definition with a quotation form D.W.M. Waters,
 
 The Constructive Trust
 
 4 (1964):
 

 “ ‘Fiduciary’ is a vague term, and it has been pressed into service for a number of ends.”
 

 In contrast, there is nothing vague about the noun “trustee.”
 
 Black’s
 
 definition of that noun at 1519 is narrow and precise:
 

 1. One who, having legal title to the property, holds it in trust for the benefit of another and owes a fiduciary duty to that beneficiary.
 

 Expanding on that definition,
 
 Black’s
 
 says:
 

 Generally, a trustee’s duties are to convert to cash all debts and securities that are not qualified legal investments, to reinvest the cash in proper securities, to protect and preserve the trust property, and to ensure that it is employed solely for the beneficiary, in accordance with the directions contained in the trust instrument.
 

 Consistent with
 
 Black’s
 
 definition of a “trustee” as one who has legal title to “property” and holds that property “in trust for the benefit of another,” every case cited in defendants’ briefs on this point involves an identifiable fund or assets over which the individual trustee in question exercised the fiduciary duty of a trustee.
 

 That is true of
 
 Morrissey v. Segal,
 
 526 F.2d 121 (2d Cir.1975), the only case defendants cite which involved an action un
 
 *334
 
 der § 501(b) of the LMRDA.
 
 Morrissey
 
 is the case in which the Second Circuit held that reimbursement of a defendant’s attorney’s fees was permissible under § 501(b), rather than mandatory. More pertinent to the present point, the
 
 Morris-sey
 
 defendants were sued in their capacities as trustees of the union’s pension fund. (The defendant trustees were also union officers. Union officers frequently double in brass as trustees of the union’s pension funds.) To the extent that the defendants succeeded in defending against claims that they had breached their duties as trustees, the Second Circuit approved reimbursement of their attorney’s fees. The Court of Appeals based its opinion upon the law of trusts, stating at 526 F.2d at 128:
 

 The defendant trustees, however, are entitled to be reimbursed for those fees incurred in defending their behavior in the non-Perry payments. The beneficent aims of § 501 should not be frustrated by construing its terms with such uncompromising rig- or that competent individuals are discouraged from assuming a fiduciary role in union affairs. A pension trustee who has acted blamelessly in a good faith effort to promote what he reasonably believed to be the purposes of the trust should not be required to shoulder the burden of his defense when subsequent events prove his decision to have been an improvident one. See 3 Scott, The Law of Trusts, § 188.4 at 1535 (3d ed.1967).
 

 The other cases cited by defendants fall within this same principle of trust law. Several involve ERISA, that federal statute which one court has noted “abounds with the language and terminology of trust law.”
 
 Maher v. Strachan Shipping Co.,
 
 817 F.Supp. 43, 45 (E.D.La.1993), (citing and quoting
 
 Firestone Tire and Rubber Co. v. Bruch,
 
 489 U.S. 101, 110, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). Other ERISA cases cited by defendants are
 
 New York State Teamsters Council v. Estate of DePerno,
 
 18 F.3d 179 (2d Cir.1994), and
 
 New York State Teamsters Conference Pension and Retirement Fund v. Hoh,
 
 561 F.Supp. 687 (N.D.N.Y.1983). Other cases cited by defendants which involve labor unions address other issues entirely. These include
 
 Bradley v. O’Hare,
 
 11 A.D.2d 15, 202 N.Y.S.2d 141 (N.Y.A.D. 1 . Dept.1960) in which an international union sued a local to recover assets in the local’s treasury at the time of its disaffiliation with the international union, and
 
 CC Lumber Co., Inc. v. Waterfront Commission of New York Harbor,
 
 31 N.Y.2d 350, 339 N.Y.S.2d 937, 292 N.E.2d 1 (1972), which reinstated an order of the Waterfront Commission denying an application for a stevedore’s license on the ground of association with organized crime. Other cases arise out of common law trusts. These include
 
 Grey v. First National Bank,
 
 393 F.2d 371 (5th Cir.1968),
 
 cert. denied,
 
 393 U.S. 961, 89 S.Ct. 398, 21 L.Ed.2d 374 (1968), in which trust beneficiaries sued the'bank/trustee for improper dealing with the trust assets;
 
 Weidlich v. Comley, 267
 
 F.2d 133 (2d Cir.1959);
 
 Downing v. Marshall,
 
 37 N.Y. 380 (N.Y.1867);
 
 In re Bishop’s Will,
 
 277 A.D. 108, 98 N.Y.S.2d 69 (N.Y.A.D. 1 Dept.1950);
 
 Application of Kettle,
 
 73 A.D.2d 786, 423 N.Y.S.2d 701 (N.Y.A.D. 4 Dept.1979); and
 
 Matter of Estate of Iskyan,
 
 167 Misc.2d 492, 641 N.Y.S.2d 785 (Sur., Nassau Cty.1996).
 

 These cases all stand for the familiar proposition in trust law that a trustee may look to the trust assets for payment of attorney’s fees which the trustee has incurred in successfully defending himself against claims that he breached his fiduciary duties as a trustee. Defendants at bar cite no case, and I have found none, in which union officers have been regarded as “trustees” in the discharge of their ordinary day-to-day governance of a union’s affairs for the purpose of entitling them to reimbursement of attorney’s fees, as they would be entitled if in fact acting as trustees of an identifiable fund. The distinction is illustrated by one of defendants’ cases
 
 *335
 

 Hoh,
 
 561 F.Supp. at 689 n. 1, where District Judge Miner (as he then was) said:
 

 Defendants here are entitled to reimbursement from assets from the teamster fund under established common law principles permitting such awards from trust fund assets,
 

 citing
 
 Alyeska,
 
 421 U.S. at 257, 95 S.Ct. 1612.
 

 The Court of Appeals in the case at bar has held that § 501(b) of the LMRDA, the federal statute directly addressing the responsibilities and relationships between unions and their officers, does not compel reimbursement of attorney’s fees incurred by vindicated officers. I do not think that principles of the law of trusts, which apply to circumstances quite different from those presented in the case at bar, entitle the present defendants to avoid the effect of the Second Circuit’s recently declared rule.
 

 For the foregoing reasons, I conclude that the defendants cannot derive from any aspect of New York statutory law, or from the state or federal common law of trusts, a viable ground for reimbursement of their attorney’s fees.
 

 Defendants’ renewed motion for attorney’s fees and expenses is denied.
 

 It is SO ORDERED.
 

 [1]
 

 . They are defendants Ferrara, Malave, Marshall, Binger, Moore, Rath, Saunders and Shephard. Defendants Turner and King, who arc also former union officers, do not assert claims for attorney’s fees.
 

 [2]
 

 . The adjective "Delphic” is derived from or means "ambiguous” or "obscure.” Webster’s relating to ancient Delphi or its oracle, and
 
 New Collegiate Dictionary
 
 (1976) at 300.
 

 [3]
 

 . The first ground was based on § 501(b), now precluded by the Court of Appeals’ decision.
 

 [4]
 

 . The caption to Part V of defendants' present Main Brief at 45 reads: "Reimbursed Defense Costs is [sic ] Warranted Under the Bad Faith Exception to the American Rule." The clear purpose of that caption is to reassert the ground for reimbursement which the Union concedes defendants advanced in 1994. The text under the caption begins with the bracketed word "[EXCISED]”, which is quite baffling in its context, and not lucidly explained by the Reply Brief’s discussion at 14-15. Defendants' position appears to be that their other asserted grounds are so persuasive that the "bad faith” exception need not be further briefed, noting in their present Main Brief at 45 that "[g]iven the independent sufficiency of each ground briefed above, ... defendants have here excised this section of their brief and will submit same only upon request of the Court.” I decline to accede to that display of hubris or to make such a request, and accordingly will consider only the authorities defendants cited on the "bad faith” ground in their 1994 briefs, together with the Union’s authorities and the fruits of the Court’s own research. But there is no substance to the Union's contention that defendants have not preserved this ground for determination by this Court.
 

 [5]
 

 . The defendants were not barred from urging in the Court of Appeals grounds for reimbursement that they did not assert initially in this Court. Defendants had prevailed in this Court by receiving a judgment for attorney's fees under § 501(b); and "[t]he prevailing party may, of course, assert in any reviewing court any ground in support of his judgment, whether or not that ground was relied upon or even considered by the trial court.”
 
 Federal Election Commission v. Survival Education Fund, Inc.,
 
 65 F.3d 285, 290 (2d Cir.1995) (citation and internal quotation marks omitted).
 

 [6]
 

 . The question remains whether these grounds are precluded by the Court of Appeals' reference to those "general equitable principles” which defendants cannot invoke as a matter of law. Those questions are considered under Part III.,
 
 infra.
 

 Contrary to the Union’s contention, the “common benefits” and "union democracy” grounds, first urged by defendants in the Court of Appeals, are not precluded by the Stipulated Order of Dismissal endorsed by District Judge Stein on July 11, 1996, which put an end to the other controversies between the parties. That Stipulation provides in pertinent part:
 

 Nothing in this agreement shall be construed to affect the parties' rights, obli-
 
 *318
 
 galions or liabilities under the "Memorandum and Order” of Judge Charles Haight dated May 25, 1995, reported at 886 F.Supp. 399.
 

 That language does no less but no more than to leave the defendants and the Union free to make all the arguments of inclusion or preclusion, preservation or abandonment that they put forward on the present motion, and which this Opinion resolves.
 

 [7]
 

 . Defendants’ Main Brief at 16 begins their argument on this point by citing and quoting from
 
 Amalgamated Clothing and Textile Workers Union v. Wal-Mart Stores, Inc.,
 
 54 F.3d 69 (2d Cir.1995). The title of the case creates the fleeting and false impression of a labor law case; in point of fact, the named plaintiff-appellee union was one of several institutional shareholders of Wal-Mart who successfully sued that company to enjoin the omission of a shareholder proposal from proxy solicitation materials, in violation of securities regulations. The Second Circuit, reasoning that the securities laws address “concerns regarding corporate suffrage,” awarded plaintiffs attorney's fees on a common benefit analysis, observing that "[i]n this case, there is no dispute that the class of persons benefilted is easily identifiable, that the benefits were conferred up[on the class], and that the costs of the litigation could be shifted to those benefit-ting.”
 
 Id.
 
 at 71. Neither the Second Circuit's holding nor its rationale in
 
 Wal-Mart
 
 lends any support to defendants' attempt to apply a common benefit analysis to their claim for attorney's fees.
 

 [8]
 

 . In
 
 Wal-Mart,
 
 fn. 7
 
 supra,
 
 the Second Circuit cited and quoted from
 
 Hoeing
 
 in delineating the requirements for application of the common benefit exception.
 
 See
 
 54 F.3d at 71.
 

 [9]
 

 . The conclusion in text denying defendants reimbursement of their attorney's fees is consistent with my prior holding in this case that § 501(a) of the LMRDA did not create a cause of action in plaintiffs' favor for intangible losses.
 
 See Doyle v. Turner,
 
 1993 WL 183788 at *13 (S.D.N.Y.1993) (Plaintiffs’ claim "that the fiduciary duty with respect to Union property imposed by § 501(a) includes a duty with respect to intangible property, such as the interest in fair union elections and free expression" is “clearly precluded by
 
 Head v. Brotherhood of Railway Clerks,
 
 512 F.2d 398 (2d Cir.1975).”) In
 
 Head,
 
 the Second Circuit dismissed a § 501 suit by a union member against the union's officers that principally challenged a restructuring of the union, although the restructuring involved some salary increases for some officials and some shift in funds from local lodges to division offices. The Court of Appeals concluded that "the conduct attacked in this case is not within the intended scope of § 501. The defendants have been charged not with misappropriating or misusing union funds but rather with restructuring the union. It is not for the courts to mediate such disputes.” 512 F.2d at 401. Nor is it for the courts to interfere with a union’s decision under § 501(b) to deny reimbursement of attorney’s fees to vindicated former officers. In any event, it would be anomalous for a court to base an award of attorney’s fees to successful defendants upon a statutory rationale of preserving "union democracy” where the statute relied upon does not create a cause of action for such an intangible loss.
 

 [10]
 

 . The district courts may also impose sanctions, including an award of attorney’s fees, pursuant to Rule 11, Fed.R.Civ.P. (authorizing the sanctioning of a party and its attorney for objectively unreasonable litigation conduct), and 28 U.S.C. § 1927 (authorizing the sanctioning of an attorney for subjective bad faith in conducting litigation).
 
 See generally Sussman,
 
 56 F.3d at 456-460. The defendants at bar do not assert claims for their
 
 *324
 
 attorney's fees under either of these provisions.
 

 [11]
 

 . The spread of dates for this letter given in text is necessitated by the fact that the copy of the Hunsucker letter submitted with the motion papers is not dated. The body of the letter recites that the investigation to which it refers was “completed May 9, 1985,” and the president of the national union is given until
 
 *325
 
 July 29, 1985 to submit any additional evidence. The record does not reveal whether the president did so.
 

 [12]
 

 .
 
 Johnson v. Kay
 
 bore the docket number 5. D.N.Y. 87 Civ. 6482(RWS).
 

 [13]
 

 . The docket number of
 
 Johnson v. Local 1199
 
 was S.D.N.Y. 85 Civ. 5388(CSH).
 

 [14]
 

 . In point, of fact, the contemplated
 
 March
 
 election was evidently delayed, since, as I have noted, "the plaintiffs prevailed in the election held in
 
 June,
 
 1986." 1993 WL 183788 at *1. That change in date is not material to the analysis in text.
 

 [15]
 

 . Copies of these accountants' reports are attached to the affidavit of James Reif, Esq., filed on August 7, 1991, in connection with the motion of plaintiffs in the captioned case to file a second amended complaint.
 
 See
 
 opinion reported at 1993 WL 183788.
 

 [16]
 

 . 29 U.S.C. § 501(b) provides in part:
 

 When any officer, agent, shop steward, or representative of any labor organization is alleged to have violated the duties declared in subsection (a) of this section and the labor organization or its governing board or officers refuse or fail to sue or recover damages or secure an accounting or other appropriate relief within a reasonable time after being requested to do so by any member of the labor organization, such member may sue such officer, agent, shop steward, or representative in any district court of the United States or in any State court of competent jurisdiction to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organization. No such proceeding shall be brought except upon leave of the court obtained upon verified application and for good cause shown, which application may be made ex parte.
 

 [17]
 

 . 29 U.S.C. § 106 provides:
 

 No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liabile in any court of the United States for the unlawful acts of individual officers, mem■bers, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.
 

 [18]
 

 . Plaintiffs alleged federal subject matter jurisdiction under the LMRDA, 29 U.S.C. § 501(b), and the RICO statute, 18 U.S.C. § 1964(a) and (c).
 

 [19]
 

 . Defendants’ main brief at 4 miscited
 
 Sequa
 
 as "825 F.Supp. 203.” The correct citation appears in their reply brief.
 

 [20]
 

 .
 
 The court noted in
 
 Woodley
 
 that "the New York [Labor Law] statute diverges from the federal [LMRDA § 501(b)] in allowing, additionally, the member’s prosecution of the action where 'such request would be futile.’ Thus where futility is shown, no request need be made, pleaded or proved." 421 N.Y.S.2d at 800. The plaintiffs in
 
 Woodley
 
 made that showing.
 
 Id.
 
 In the case at bar, I have rejected defendants’ contention that plaintiffs’ bad faith should be inferred from their failure to comply with the “request” prerequisite in LMRDA § 501(b). See Part IV. 1., supra.
 

 [21]
 

 . For that proposition Judge Sand cited
 
 Morrissey v. Segal,
 
 526 F.2d 121, 127 (2d Cir.1975);
 
 McNamara v. Johnston,
 
 522 F.2d 1157, 1167 (7th Cir.1975),
 
 cert. denied,
 
 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976); and
 
 Milone v. English,
 
 306 F.2d 814, 817 (D.C.Cir.1962).
 
 See
 
 discussion at 732 F.Supp. at 436-37.
 
 Morrissey v. Segal
 
 is the Second Circuit case I construed as entitling the defendants at bar to compelled reimbursement by the Union of their attorney’s fees, a construction which the Second Circuit rejected in its opinion leading to this remand.
 

 [22]
 

 . Although one cannot tell from his opinion, Judge Sand might have considered the BCL inapplicable to Local 1804-1 because the un-ión was not a corporation but an unincorporated association, as is the Union at bar. See discussion of the Union’s status in text,
 
 infra.
 

 [23]
 

 . 29 U.S.C. § 501(a) provides in pertinent part:
 

 The officers, agents, shop stewards and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its member and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolution of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any manner connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization.